PD-0398-15

PD-0398-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 4/6/2015 4:24:36 PM
Accepted 4/15/2015 10:05:21 AM
ABEL ACOSTA
CLERK

NO. _____

In the
## Court of Criminal Appeals
for the
## State of Texas

FILED IN
COURT OF CRIMINAL APPEALS

April 15, 2015

ABEL ACOSTA, CLERK

### No. 07-14-00433-CR
In the Court of Appeals for the
Seventh District of Texas

### No. 2012-435,942
In the 140th District Court
of Lubbock County, Texas

## EX PARTE
## THOMAS MICHAEL DIXON
*Petitioner-Appellant*

### PETITION FOR DISCRETIONARY REVIEW

**DANIEL W. HURLEY**
Tex. SBN 10310200
**FRANK SELLERS**
Tex. SBN 24080305
**AARON R. CLEMENTS**
Tex. SBN 00795861
Email: aaronrc@swbell.net
Hurley, Guinn & Sellers
1805 13th Street
Lubbock, Texas 79401
(806) 771-0700 phone
(806) 763-8199 fax

**SELDEN HALE**
Attorney at Law
310 Southwest 6th Avenue
Amarillo, Texas 79101
(806) 372-5711 phone
(806) 372-1646 fax

ATTORNEYS FOR APPELLANT

ORAL ARGUMENT WAIVED

IDENTITY OF JUDGES, PARTIES & COUNSEL

| | |
|---|---|
| **Trial Court Judge:** | Hon. Jim Bob Darnell<br>140th District Court of Lubbock County, Texas |
| **Petitioner-Appellant:**<br>**Trial and Appellate Counsel:** | Thomas Michael Dixon<br>Daniel W. Hurley<br>Frank Sellers<br>Aaron R. Clements<br>Hurley, Guinn & Sellers<br>1805 13th St.<br>Lubbock, Texas 79401<br>(806) 771-0700<br>(806) 763-8199 fax |
| | Selden Hale<br>310 Southwest 6th Avenue<br>Amarillo, Texas 79101<br>(806) 372-5711<br>(806) 372-1646 fax |
| **Respondent-Appellee:**<br>**Trial Counsel:**<br><br><br><br>**Appellate Counsel:** | The State of Texas<br>Hon. Matt Powell<br>Lubbock County Criminal District Attorney<br>Sunshine Stanek, Ass't District Attorney<br>Wade Jackson, Ass't District Attorney<br>Lauren Murphree, Ass't District Attorney<br>Jeff Ford, Ass't District Attorney<br>Lauren Murphree, Ass't District Attorney<br>Wade Jackson, Ass't District Attorney<br>Lubbock County District Attorney's Office<br>P.O. Box 10536<br>Lubbock, Texas 79408-0536 |
| | State Prosecuting Attorney's Office<br>P.O. Box 13406<br>Austin, Texas 78711-3046 |

i

# TABLE OF CONTENTS

INDENTITIES OF JUDGES, PARTIES, & COUNSEL............................................i

TABLE OF CONTENTS.................................................................. ii

INDEX OF AUTHORITIES..............................................................iv

STATEMENT REGARDING ORAL ARGUMENT ................................................1

STATEMENT OF THE CASE..............................................................2

STATEMENT OF PROCEDURAL HISTORY....................................................3

GROUNDS FOR REVIEW ...............................................................4

    I.    THE COURT OF APPEALS HAS DEPARTED FROM THE ACCEPTED AND USUAL COURSE OF JUDICIAL PROCEEDINGS AND HAS SANCTIONED SUCH A DEPARTURE BY THE TRIAL COURT BY APPROVING BAIL IN A CAPITAL CASE IN AN AMOUNT AN ORDER OF MAGNITUDE LARGER THAN ANY PREVIOUSLY APPROVED IN A CAPITAL MURDER CASE IN THIS STATE, RESULTING IN THE INSTANT BAIL BEING USED AS AN INSTRUMENT OF OPPRESSION ...........................4

ARGUMENT AND AUTHORITIES..........................................................5

    A.    Summary of Facts and Court of Appeals' Decision ...........................5

    B.    Standard of Review ......................................................9

    C.    Factors for Determining Bail.............................................10

    D.    The Court of Appeals failed to properly compare the bail amount in this case to those set in previous capital murder cases, which amount gives rise to an inference that bail in this case is excessive and oppressive ...............................11

E.     A proper comparison of the facts of this case measured against the criteria for setting of bail, in light of the bail deemed appropriate in other capital cases, reveals that the trial court abused its discretion and that the Court of Appeals erred in holding otherwise .......................................................13

F.     The trial court's bail amount has the effect of operating as an instrument of oppression ...........................................................19

CONCLUSION AND PRAYER ..............................................................21

CERTIFICATE OF SERVICE ...............................................................22

CERTIFICATE OF COMPLIANCE.......................................................22

APPENDIX

iii

# INDEX OF AUTHORITIES

**CASES** **PAGE**

TEXAS

*Balboa v. State*, 612 S.W.2d 553, 556 (Tex.Crim.App. 1981) ...............................10

*Ex parte Beard*, 92 S.W.3d 566 (Tex. App. – Austin 2002, pet. ref'd)............passim

*Ex parte Estrada*, 398 S.W.3d 723, 727 (Tex. App. – San Antonio
    2008, no pet.) ......................................................................................11, 13

*Ex parte Gonzalez*, 383 S.W.3d 160 (Tex. App. – San Antonio 2012,
    pet. ref'd) ...................................................................................11-13, 15-16

*Ex parte Henson*, 131 S.W.3d 645 (Tex. App. – Texarkana 2004).........................19

*Ex parte Ivey*, 594 S.W.2d 98 (Tex. Crim. App. 1980) ...........................................19

*Ex parte Rubac*, 611 S.W.2d 848, 850 (Tex. Crim. App. 1981) (panel op.).......9, 11

*Ex parte Scott*, 122 S.W.3d 866, 868 (Tex. App. – Fort Worth 2003, no pet.).......10

*Ex parte Vasquez*, 558 S.W.2d 477, 479 (Tex. Crim. App. 1977) ..........................10

*In re Durst*, 148 S.W.3d 496 (Tex. App. – Houston [14th Dist.] 2004,
    no pet.) (op. on reh'g) .........................................................................19

*Ludwig v. State*, 812 S.W.2d 323 (Tex. Crim. App. 1991).....................................11

*Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991)
    (op. on reh'g) ........................................................................................9

**CONSTITUTIONAL PROVISIONS**

U.S. CONST. AMEND. VIII ...........................................................................................10

TEX. CONST. ART. I, §§ 11, 13 .......................................................................................10

**STATUTES**

TEX.CODE CRIM.PROC. ANN. ART. 17.01 (Vernon 2013).........................................10

TEX. CODE CRIM. PROC. ANN. ART. 17.15 (Vernon 2013) .......................... 10-11, 21

**RULES**

TEX.R.APP.P. 66.............................................................................................20

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is waived in order to expedite consideration of this case by the Court.

## STATEMENT OF THE CASE

Appellant Thomas Michael Dixon was arrested on July 16, 2012, and charged with capital murder. (3 RR 4: DX 1)[1]. His bail was set at $10,000,000, an amount beyond his ability to meet. *Id*. Dixon was subsequently indicted for two counts of capital murder alleging that he hired a third party to kill the boyfriend of Dixon's former romantic interest.

Dixon's trial began on October 27, 2014. (CR 8). After a three week jury trial, the jury was unable to reach a verdict. *Id.* The trial court declared a mistrial. *Id.*

On December 10, 2014 (almost two and a half years after his original arrest), Dixon filed a writ of habeas corpus seeking a bond reduction, challenging his continued incarceration pending trial. *Id.* at 5 After a hearing on December 17, 2014, the trial court refused to reduce Dixon's bail. (*Id.* at 15). The Court of Appeals upheld the trial court's decision on March 6, 2015, and this Petition follows.

---

[1] Citations to the record appear as follows:
   **Writ Hearing**—Reporter's Record: __ RR __; Defense Exhibit: DX __.
   **Clerk's Record:** CR __.
   **Original Trial Transcript:** __ TR __, where the first blank represents the day of trial and the second blank the transcript page. All citations to the original trial come from DX 14 offered at the writ hearing. The writ hearing exhibit volume lists this as a State's Exhibit that was mailed to the Court of Appeals.

## STATEMENT OF PROCEDURAL HISTORY

The Court of Appeals rendered its decision affirming the judgment of the trial court on March 6, 2015. No motion for rehearing was filed.

## GROUNDS FOR REVIEW

    I.    THE COURT OF APPEALS HAS DEPARTED FROM THE ACCEPTED AND USUAL COURSE OF JUDICIAL PROCEEDINGS AND HAS SANCTIONED SUCH A DEPARTURE BY THE TRIAL COURT BY APPROVING BAIL IN A CAPITAL CASE IN AN AMOUNT AN ORDER OF MAGNITUDE LARGER THAN ANY PREVIOUSLY APPROVED IN A CAPITAL MURDER CASE IN THIS STATE, RESULTING IN THE INSTANT BAIL BEING USED AS AN INSTRUMENT OF OPPRESSION

The Seventh Court of Appeals held that the trial court did not abuse its discretion in refusing to lower a bond set at ten million dollars – an amount almost seven times greater than any bail amount previously approved by a Texas appellate court in a capital murder case. As such, the Court of Appeals' opinion in this case conflicts directly with decisions of this Court and with decisions of its sibling courts of appeals, and furthermore represents an egregious departure from the usual course of judicial proceedings so as to call for this Court's exercise of its power of supervision.

4

## ARGUMENT AND AUTHORITIES

### A.      Summary of Facts and Court of Appeals' Decision

In his application for writ of habeas corpus filed with the trial court, Petitioner-Appellant Thomas Michael Dixon (hereinafter "Dixon" or "Petitioner") asserted that the amount of bail set at ten million dollars to secure his release from custody pending retrial was both excessive and oppressive and should be reduced. (CR 5-7).  At the habeas hearing, Dixon submitted the reporter's record of the underlying mistrial along with affidavits from two jurors as to the degree of split within the jury which resulted in that mistrial.  (3 RR 17: DX 14).  The underlying trial record reflects that David Shepard killed Lubbock pathologist Joseph Sonnier, and the State attempted to show that Dixon paid Shepard to do so because of Dixon's jealousy over Sonnier's relationship with Dixon's former girlfriend, Richelle Shetina.  Slip Op. at 2.  While Shepard pled guilty to capital murder for hire in exchange for a life sentence, he testified at trial that Dixon never asked nor paid Shepard to kill Sonnier, and that he pled guilty solely to avoid the death penalty.  *Id.*  Dixon additionally testified in his own defense that he sought to obtain evidence of Sonnier's infidelity in an effort to prove such infidelity to Shetina, and that Shepard's murder of Sonnier was an independent act never contemplated or asked for by Dixon.  *Id.* at 2-3.

Dixon offered testimony of a Lubbock County bail bondsman, Ken Herzog, who testified that he would not be able to write such a bond, and that even if he could, the requirements for payment would themselves be onorous, including a cash payment of one million dollars plus collateral to secure a substantial portion of the bond. (2 RR 10).

Dixon's mother additionally testified. She noted that Dixon was born and raised in Spearman, Texas, to a family with roots in the original Spearman settlers and that Dixon still has family and friends there. (2 RR 18-19). She added that he has deep ties to the Amarillo area, with his house, his former medical practice, and a break-even spa business located there, and with three children who all live in Amarillo. (2 RR 19-20, 28). Mrs. Dixon also noted that she contacted all of the bonding companies in Lubbock in an effort to secure Dixon's pretrial release, and that the only one willing to write Dixon's bond required a one million dollar down payment in cash and collateral of at least three million dollars, an amount beyond not only Dixon's means, but that of his family as well. (2 RR 23-24).

Mrs. Dixon also testified that she was familiar with Dixon's finances, and that said finances and assets were essentially depleted. Since his arrest, Dixon has had no income. (2 RR 21). Mrs. Dixon noted that while Dixon owns a home in Amarillo, it is encumbered for approximately the full market value. (2 RR 25-27). Dixon also proffered that while he at one time had a several cars and a trust fund

possessing substantial assets, those assets had been liquidated and used in payment of his trial expenses, which were substantially larger than one million dollars. (2 RR 24, 34). Mrs. Dixon added that Dixon had outstanding mortgage obligations as well as contractual alimony and child support payments totaling approximately $7,800 per month which were being covered by herself and Dixon's sister. (2 RR 25). Mrs. Dixon noted that he is the beneficiary of an oil trust, but that the amounts Dixon realizes from that trust are in any case less than $150 per month, with the most recent check being for a substantially lesser amount. (2 RR 29-30). Dixon proffered that his only other assets are approximately $1,800.00 in cash and a collection of silver coins. (2 RR 30). Finally, Mrs. Dixon advised the trial court that Dixon was willing to submit to electronic monitoring as a condition of his release, and Dixon surrendered his passport to the court. (2 RR 17, 28).

Dixon also offered a number of previous Lubbock County capital murder indictments which reflected the bond amounts in each case. Those exhibits reflected that the highest bonds previously set in Lubbock County were for one million dollars. (3 RR 6: DX3; 3 RR 14: DX 11).

The State declined to offer any evidence other than that elicited via cross examination, but essentially argued via insinuation that since Dixon's family had paid over a million dollars in his defense at trial, that Dixon and/or his family must have substantial additional resources, and that for this reason, his bond should

remain ten times as high as any previously set in Lubbock County. (2 RR 35). Despite this lack of countervailing evidence and a showing that the bail amount set was an order of magnitude greater than any previous set in Lubbock County (not to mention the State generally), the trial court nevertheless denied relief. (2 RR 37; CR 15). The trial court specifically stated that its reason for refusing to reduce the bond amount was "because of the fact that he's charged with capital murder and still facing the possibility of life in the penitentiary without parole, and even the possibility of the death penalty," specifically giving that factor sole consequence and disregarding other statutory and common law factors. (2 RR 36).

The Court of Appeals found that this record did not establish an abuse of discretion. In so doing, the Court of Appeals did not weigh the ten million dollar bail amount and the evidence against the relevant Constitutional and statutory criteria, including whether a bail amount almost seven times higher than any previously imposed in a single capital murder case itself raises an inference that bail is excessive and being used as an instrument of oppression, but rather focused its analysis on giving total deference to the trial court's possible evidentiary weight and credibility determinations. See Slip Op. at 10-12. In so doing, the Court of Appeals – in contravention to the opinions of this Court and other courts of appeals – confused a trial court's discretion in giving weight and credence to particular evidence with analysis of how those particular factors combine to reach a legal

conclusion on the reasonableness of a given bond amount.  See, *e.g.,* Slip Op. at 11 (despite evidence of Dixon's personal situation and ties to Texas and Amarillo being "essentially undisputed", the trial court could nevertheless "have found them unconvincing", and that "determinations of the weight to be given particular testimony *and of its bearing on the factors for setting bail* were determinations to be made by the trial court." (emphasis added)).  The Court of Appeals thereby abandoned its duty independently "to measure the trial court's ruling against the relevant criteria."  *Ex parte Beard*, 92 S.W.3d 566, 573 (Tex. App. – Austin 2002, pet. ref'd).

## B.    Standard of Review

An appellate court's review of a trial court's decision on a request for reduction of bail is reviewed for abuse of discretion.  *Ex parte Rubac*, 611 S.W.2d 848, 850 (Tex. Crim. App. 1981) (panel op.).  Abuse of discretion review requires more than merely concluding that a trial court did not act in an arbitrary or capricious fashion, but requires a reviewing court to "measure the trial court's ruling against the relevant criteria by which the ruling was made."  *Beard*, 92 S.W.3d at 573, citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g).

9

### C. Factors for Determining Bail

Bail is the security given by a defendant that he will appear in court to answer the accusation brought against him. TEX.CODE CRIM.PROC. ART. 17.01 (Vernon 2013). Bail balances the presumption of innocence of the accused with the compelling interest of the State that the accused appear to answer the accusation against him. *See Balboa v. State*, 612 S.W.2d 553, 556 (Tex.Crim.App. 1981). Excessive bail is constitutionally prohibited. U.S. CONST. AMEND. VIII; TEX. CONST. ART. I, §§ 11, 13. Bail is excessive if it is "set in an amount greater than is reasonably necessary to satisfy the government's legitimate interests." *Beard,* 92 S.W. 3d at 573. The primary purpose of an appearance bond (that is, the government's principal legitimate interest) is to secure the presence of the defendant at trial on the offense charged. *Ex parte Vasquez,* 558 S.W.2d 477, 479 (Tex. Crim. App. 1977); *Ex parte Scott*, 122 S.W.3d 866, 868 (Tex. App. – Fort Worth 2003, no pet.).

Texas has enacted a statutory framework guiding courts in ensuring defendants' constitutional rights to reasonable bail are secured. TEX. CODE CRIM. PROC. ANN. ART. 17.15 (Vernon 2013) specifically identifies five specific factors in determining reasonable bail including that bail "should be sufficiently high to give reasonable assurance that the undertaking [of appearing for trial] will be complied with" but that bail should not be "so used as to make it an instrument of

10

oppression." Additionally, the nature and circumstances of the alleged offense are to be considered along with the ability to make bail and the future safety of a victim of the alleged offense and the community generally. *Id.* Additionally, courts look to several common law factors such as a defendant's work record, family and community ties, length of residency, offered conditions of bond, and any aggravating circumstances alleged to have been involved in the offense. *See Rubac*, 611 S.W.2d at 849-50.

> **D.** **The Court of Appeals failed to properly compare the bail amount in this case to those set in previous capital murder cases, which amount gives rise to an inference that bail in this case is excessive and oppressive.**

In the entirety of reported Texas cases, the highest bail ever approved by an appellate court in a single-count capital murder case appears to be $1,500,000.00. *Ex parte Gonzalez*, 383 S.W.3d 160 (Tex. App. – San Antonio 2012, pet. ref'd). That case expressly noted that prior to its particular facts, the highest bail approved (reported or not) "even in the most egregious capital murder cases" was $1,000,000.00. *Id*. at 164, citing *Ex parte Estrada*, 398 S.W.3d 723 (Tex. App. – San Antonio 2008, no pet.). In examining bail amounts, both this Court and the courts of appeals have been guided by previously approved bail amounts, and have viewed wildly disproportionate bail amounts with a strong suspicion. *Ludwig v. State*, 812 S.W.2d 323, 324 (Tex. Crim. App. 1991) (plurality op.) (observing that at that time, "this Court [had] yet to condone a bail amount even approaching

11

seven figures, even in a capital case."); *Estrada*, 398 S.W.3d at 727 (noting that a detailed review found "no reported Texas case sustaining bail in the amount of $1,000,000, even in the *most egregious capital murder cases*") (emphasis added); *Gonzalez*, 383 S.W.3d at 167 (Tex. App. – San Antonio 2012, pet. ref'd) (Simmons, J., concurring, specifically noting that while the court approved a $1.5 million bail that was "fifty percent higher than any bail amount previously upheld for a single capital murder charge," she felt "compelled to caution against imposing exceedingly large bail amounts that violate the Constitution's prohibition against excessive bail."); *Beard*, 92 S.W.3d at 574 (specifically noting that consideration of the bail set in other capital murder cases provided appropriate guidance against which an $8,000,000 bail was an abuse of discretion).

The bail amount set in this case – ten million dollars – is almost seven times higher than that set in *Gonzalez*. As was pointed out to the Court of Appeals, this leads to a presumption that bail was set excessively high, in itself discharging Dixon's burden of demonstrating his entitlement to a reduction. By failing to properly consider the amount of bail set in this case against the backdrop of prior approved bail amounts, the Court of Appeals decided this case in a way which conflicts with this and other courts of appeals, and has departed from the usual course of judicial proceedings as to warrant this Court's exercise of its power of supervision.

**E.     A proper comparison of the facts of this case measured against the criteria for setting of bail, in light of the bail deemed appropriate in other capital cases, reveals that the trial court abused its discretion and that the Court of Appeals erred in holding otherwise.**

The Court of Appeals relied heavily on language from *Beard* which noted that reported cases have some limitations on usefulness to completely dismiss the backdrop of reported (and unreported) Texas cases disapproving high bail amounts.  Slip Op. at 12, citing *Beard*, 92 S.W.3d at 571.  In so doing, the Court of Appeals ignored (1) *Beard's* subsequent note that "[n]evertheless, a review of some recent capital murder bail cases is instructive" and (2) the entirety of caselaw developed since *Beard*'s 2002 decision, which has increasingly become lengthy and extended.  See, e.g., *Estrada*, 398 S.W.3d 723; *Gonzalez*, 383 S.W.3d 160; *Beard*, 92 S.W.3d at 571-2.

Turning to the individual bail factors against the backdrop of precedent, in this case, the Court of Appeals focused on the habeas court's role as having also been the trial court as justifying giving outside credence to the trial court's possibly having given outsized weight to the nature and strength of the case against Dixon as a reason justifying approval of the instant bail.  By so doing, the Court of Appeals – which had the trial court record before it and which was able to succinctly summarize the factual nature of this case for itself – abdicated its role to independently and to measure the trial court's refusal to grant relief against the

statutory criteria in light of prior cases interpreting those same criteria. This case involved an alleged murder-for-hire against a specific target for a specific motive, and Dixon was not accused of having personally been involved in the killing of that specific target. It is undisputed that Dixon has no prior criminal history. There was evidence from the fact that Dixon has spent two and a half years in jail awaiting trial that he was (and remains) unable to make bail, and while the Court of Appeals faulted Dixon for presenting "meager" evidence of his financial condition, that "meager" evidence did include many of the most relevant specifics of major financial assets looked to by this court and other courts of appeals in bail cases (i.e., there was testimony regarding Dixon's home ownership and value vs. encumbrances, car ownership, and ownership and liquidation of other assets as well as testimony regarding his ongoing liabilities to paint a clear picture that Dixon himself is destitute and relying on the largesse of his relatives). There was also "essentially undisputed" evidence of Dixon's ties to the State of Texas, including his upbringing, his practice of medicine in the Amarillo community for almost ten years at the time of the alleged offense, and his relatives (including children and his mother) living in the Amarillo and Spearman areas. There was no evidence that Dixon presents a threat to community safety; even taking the State's allegations as true, his jealousy and anger were directed at Sonnier, who is now deceased. While Dixon had traveled once internationally, there was no evidence

that he has any ties (much less significant ones) to a foreign country, and Dixon sought to allay any such fears by surrendering his passport to the trial court. Furthermore, the Court of Appeals noted but failed to properly consider the fact that Dixon was initially questioned, but not arrested, regarding the murder, and that he not only had the opportunity to flee and did not do so, but actually traveled to Dallas for a car transaction and returned immediately to Amarillo. Slip Op. at 4. Finally, Dixon agreed to undergo electronic monitoring as a condition of a bail reduction, even further bolstering the affirmative evidence that Dixon is not a flight risk or a danger to the community, and that even with a reduced bail, "the undertaking will be complied with."

In contrast, the defendant in *Gonzalez* (in which bail of $1.5 million was determined appropriate) was alleged to have personally committed a violent murder of a public servant with an AR-15 type rifle, with the victim chosen evidently completely at random. 383 S.W.3d at 163. Gonzalez was shown to have an extensive criminal history, and to have recently worked or have addresses in at least five other states and to have extensive ties in Mexico via his mother and wife. *Id.* at 163-64. He was also shown to have applied for a job in Mexico and to have applied for an expedited passport. *Id.* at 164. An individual who provided information to the police was shown to personally know Gonzalez and his character and the individual and his family were also shown to be in fear of reprisal

15

from Gonzalez. *Id.* Evidence also showed that Gonzalez apparently had no qualms about using others to obtain weapons and ammunition, including the murder weapon, and that Gonzalez kept a number of weapons and sizeable quantities of ammunition at his house. *Id.* at 163-64. Gonzalez's evidence of his financial condition also came from a cousin, who (unlike Dixon's mother) was shown to be "wholly unaware of the Gonzalez family finances." *Id.* at 162. Each of these points contrasts sharply with and would support a higher amount of reasonable bail than Dixon's case, yet the Court of Appeals erroneously determined that the trial court's refusal to lower Dixon's $10 million bail was not an abuse of discretion.

Dixon's case is more in line with *Beard*, in which the defendant was charged with planning the murder of her husband and procuring another to commit the murder, and as a result, received significant assets from her husband's estate. 92 S.W.3d at 568-70. Beard's husband did not immediately die, and Beard took steps to interfere with the police investigation of the murder. *Id*. at 568-69. The court also considered that much of the assets received by Beard was consumed in the interim by basic living requirements, gifts to other family members, and significantly, by the "substantial legal expenses" incurred by both matters surrounding her husband's estate as well as the pending murder charges. *Id.* at 570. Medical records reflected that Beard had psychological problems, but was

overcoming them, and that there was an outstanding protective order against Beard in favor of her daughters as a result of Beard's acts or threats of physical violence. *Id.* The court also noted that Beard was born in California and had lived in Arizona prior to coming to Texas, and had moved several times between Travis and Tarrant counties, and was married to an individual with strong ties to Tarrant and Dallas counties, and that she had a prior felony conviction in Arizona. *Id.* at 570-71. In discussing the nature and circumstances of the offense and its effect upon an appropriate bail amount, the *Beard* court observed that:

> The murder of which Beard is accused is neither more violent in its commission nor more abhorrent in its alleged motive than other capital murders that come before the courts of this state. Although Beard is accused of planning the commission of a violent crime, there is no evidence that she has been a violent person in the past. . . . [W]e find no evidence in this record that Beard is a serious threat to community safety."

*Id.* at 572. The parallels to Dixon's case are apparent. As with Beard, Dixon is accused of planning and procuring the services of another to commit murder against a specific target for a specific reason, and Dixon has no history of violence. Against this backdrop, taking the nature and circumstances of the alleged offense into consideration, the sheer amount of Dixon's bail – twenty times that determined reasonable in *Beard* – is sufficient to invoke a presumption that Dixon's bail is excessive, and that bail is being used as an instrument of oppression.

17

The *Beard* court went on to consider that defendant's ability to make bail, and explicitly viewed the evidence "in the light most favorable to the district court's order", finding it "evident that Beard has access to financial resources exceeding those of most criminal defendants." *Id*. at 573. While the Austin court accepted these propositions *arguendo*, and even without a detailed showing of what Beard's financial resources were, that court noted that access to resources giving a defendant the "ability to afford bail in the amount set does not in itself justify bail in that amount." *Id*. The court also observed that while the State argued that Beard "would be likely to flee" if bail were reduced, the circumstances reflected that Beard had the opportunity to flee after her alleged accomplice was arrested (as did Dixon), and that she had surrendered her passport to the court (as did Dixon). *Id*. The appellate court therefore found that there was no evidence that Beard represented "an unusual flight risk." Dixon's circumstances in this regard are not only squarely in line with those in *Beard*, but Dixon went a step further by volunteering for electronic GPS monitoring, even further reducing the chance that he might fail to comply with the undertaking of bail, even if bail were set comparatively low.

*Beard* concluded by noting that the trial court had set her bail at $8,000,000, and that such amount was "more than eight times higher than the highest bail previously determined to be reasonable in a reported Texas capital murder case.

18

Such a dramatic departure from prior practice is at least suggestive of an abuse of discretion."[2]  *Id.*  As with *Beard*, the trial court in this case set bail almost seven times higher than the previous record-high reasonable bail in a capital case, and just as in *Beard*, this dramatic departure from prior practice is at least suggestive – if not presumptive – of an abuse of discretion.  The Court of Appeals in this case therefore decided this case in a way that conflicts directly with the prior decisions of the Austin Court of Appeals and with this Court and other courts of appeals, and this Court should therefore exercise its supervisory power.

## F.    The trial court's bail amount has the effect of operating as an instrument of oppression

Bail set so high as to guarantee a defendant's appearance at trial (by ensuring that the defendant does not make bail) becomes an instrument of oppression.  *Ex parte Henson*, 131 S.W.3d 645 (Tex. App. – Texarkana 2004), citing *Ex parte Ivey*, 594 S.W.2d 98, 99 (Tex. Crim. App. 1980).  This is precisely what has occurred in this case; the Court of Appeals has sanctioned the trial court's

---

[2] Without belaboring the issue, there is another Texas case instructive both for its lengthy discussions of the factors regarding bail as well as its outcome:  *In re Durst*, 148 S.W.3d 496 (Tex. App. – Houston [14th Dist.] 2004) (op. on reh'g).  In *Durst*, the now-notorious heir of a real estate magnate was charged with three third-degree felonies related to his failure to appear while on bond for murder (of which he was eventually acquitted) and for mutilation of the corpse; despite the clear evidence that Durst had access to resources in the millions, his clear willingness to abscond, given his flight after posting a $300,000 cash bond in the murder case, and his danger to the community, the 14th District Court of Appeals nevertheless found that setting bond in the amount of one billion dollars per case constituted an abuse of discretion, and reduced bond to $150,000 per case.  *Durst* at 500-502.  The *Durst* court specifically found that despite this "triple risk," conditions of bond such as monitoring and surrender of a passport specifically warrant a lowered bail amount.  *Id.* at 501.

refusal to lower bail not on the basis that a lower bail would be unlikely to secure Dixon's appearance, but simply on the basis of the trial court's possible evaluation of the case against Dixon and determination that Dixon deserves to be in prison. This makes the bail set in this case punitive in nature, and implies that it has been set deliberately beyond the ability of Dr. Dixon and his combined immediate family to satisfy. This is the definition of oppression, and this Court should exercise its power of supervision to correct the departure of the Court of Appeals from the accepted and usual course of judicial proceedings. *See* TEX.R.APP.P. 66.

Furthermore, the bail in this case has been set so high as to force Dr. Dixon to have to choose between which Constitutional right is more important to him: the right to release on reasonable bail versus the right to effective assistance of counsel. There appear to be no cases dealing with this issue, but it is troubling that the State argues that Dr. Dixon's choice to expend his previously-available resources on effective defense should be held against him, implicitly asserting that because the resources expended might have been able to secure his release *before* his first trial, that the trial court is therefore justified in continuing that punitive bail amount *after* the defendant has exhausted his available resources. *See*, *e.g.*, State's Brief on Appeal at 21. This position effectively punishes Dr. Dixon for vigorously contesting whether he is guilty of any offense (i.e., for insisting on due process of

20

law), and itself falls within the ambit of what the Framers would certainly regard as "oppression."

## CONCLUSION AND PRAYER

For the foregoing reasons, Petitioner-Appellant Thomas Michael Dixon respectfully submits that the trial court erred by refusing to reduce the amount of his bail pending a second trial for capital murder, and that the trial court's departure from the usual and accepted course of judicial proceedings has been sanctioned by the Court of Appeals' decision which itself is in conflict with opinions of this Court and other courts of appeals. Petitioner further submits that these departures and conflicts warrant this Court exercising its power of supervision, and that on consideration of the Article 17.15 factors as well as general factors for consideration in bail reduction cases, this Court should find that the trial court abused its discretion and should set bail in the amount of $100,000.00, subject to such terms and conditions as the Court deems appropriate.

Respectfully submitted,

HURLEY, GUINN & SELLERS
1805 13th Street
Lubbock, Texas 79401
(806) 771-0700
(806) 763-8199 fax

BY: /s/ Aaron R. Clements
    AARON R. CLEMENTS
    SBN 00795861
    e-mail: aaronrc@swbell.net

21

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing brief was served on opposing counsel via email to the Lubbock County District Attorney's Office, jford@lubbockcda.com and lmurphree@lubbockcda.com on this the 6th day of April, 2015, and via email to the State Prosecuting Attorney's Office, information@spa.texas.gov.

/s/Aaron R. Clements
AARON R. CLEMENTS

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with Tex.R.App.P. 9.4(i) inasmuch as according to the word count function of Microsoft Word 2003, this brief contains 4,323 words exclusive of the matters listed in that Rule, and that this is a computer-generated document using 14-point or larger typeface for all text except footnotes, which are in 12-point typeface.

/s/ Aaron R. Clements
AARON R. CLEMENTS

# APPENDIX

OPINION OF THE COURT OF APPEALS



# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

---

No. 07-14-00433-CR

---

## EX PARTE THOMAS MICHAEL DIXON

---

On Appeal from the 140th District Court
Lubbock County, Texas
Trial Court No. 2012-435,942, Honorable Jim Bob Darnell, Presiding

---

March 6, 2015

## MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

This is an appeal from the denial of habeas corpus relief for bail reduction. An indictment charged appellant, Amarillo plastic surgeon Thomas Dixon, with the capital murder of Lubbock pathologist Joseph Sonnier, III. Dixon's bail was set at $10 million and he remained incarcerated for over two years pending trial. Dixon's three-week jury trial ended in a mistrial on November 20, 2014. On December 10, Dixon filed an application for writ of habeas corpus, seeking reduction in the amount of bail. The writ issued and a hearing was convened on December 17. After the hearing, the court signed an order denying Dixon the requested relief. Findings of fact and conclusions of

law were not requested or filed. Finding the record does not establish an abuse of discretion by the trial court, we will affirm its order.

Background

Sonnier was murdered in his home on July 10, 2012. He was shot and stabbed. Under the State's theory of the case, the murder arose from Dixon's jealousy and anger over Sonnier's relationship with Richelle Shetina, with whom Dixon formerly had a relationship. The State contended Dixon was aware of his friend David Shepard's financial difficulties, and hired Shepard to kill Sonnier in exchange for three bars of silver.

Dixon and Shepard were arrested in July 2012. Shepard plead no contest to the charge of murdering Sonnier for remuneration and is serving a sentence of life without parole. In an October 2012 statement to police, Shepard said Dixon paid him three silver bars to kill Sonnier.

Shepard and Dixon testified at Dixon's trial. Dixon testified he believed Shepard killed Sonnier. His defense took the position Dixon was inculpated in the murder only by Shepard's October 2012 statement. The defense called Shepard a "con man." In his testimony, Shepard denied Dixon asked him to kill or harm Sonnier. He said Dixon gave him the bars of silver because of his financial difficulties. At times he referred to the bars as "a loan." Dixon testified the three silver bars were his investment in a health care business that Shepard, Dixon and a third man were forming.

Evidence showed Shepard made several trips to Lubbock before the murder. Dixon testified the two men planned for Shepard to photograph Sonnier in the company

2

of women other than Shetina.[1]  They eventually planned that Shepard would attempt to attach a camera to the fence at Sonnier's residence.  Dixon acknowledged he was bothered by Shetina's high opinion of Sonnier and her belief she was in a "committed relationship" with Sonnier.  He maintained, however, that his plans with Shepard never included doing harm to Sonnier.

The jury was instructed on the charged offense of capital murder and on lesser offenses, but was unable to reach a unanimous verdict.

At the habeas hearing, Dixon called two witnesses, his mother and a representative of a Lubbock bail bond company.

The bondsman testified in his opinion a bond for bail of $10 million could "probably" not be obtained in Lubbock County.  He added, however, if his company made a bond for this amount it would require $1 million "upfront" and collateral "back[ing] the biggest part of the 10 million."  Based on conversations with Dixon's family, the bondsman believed Dixon's family could not obtain a bond for bail of $10 million.  According to the bondsman, his company might consider a bond of $100,000 without collateral.

Later in the habeas hearing, Dixon's counsel informed the court that another Lubbock bail bond company would make Dixon's bond in consideration for a cash payment of $1 million and collateral worth $3 million.

---

[1] Dixon testified that at the end of February or early in March 2012 he first became aware Sonnier was "seeing a lot of . . . women" other than Shetina, and he and Shepard at that time first discussed taking pictures to prove Sonnier's conduct to Shetina.

Dixon's mother, Mary Frances Archer Dixon, testified she resides in Spearman, Texas, where the family has long-standing ties. She acknowledged Dixon was a successful plastic surgeon prior to his arrest. His three children live in Amarillo. She also agreed he owned a business known as Sensei Med Spa but denied he received income from the business or his medical practice after his incarceration. She believed Sensei Med Spa was "breaking even" although at times was unable to meet its obligations. According to Dixon's trial testimony, Sensei Med Spa was "one of" his businesses. He described it as a day spa offering massages, manicures, pedicures and facials, and said he occasionally performed injections of fillers or Botox.

Dixon has no prior criminal convictions and has apparently never been released on bond. Trial testimony indicated that shortly before Sonnier's murder, Dixon traveled to Bermuda and sailed with a friend back to New York. After his initial questioning by police regarding the murder, Dixon flew to Dallas to pick up a car but immediately returned to Amarillo.

Dixon's mother also testified to his family's participation in his expenses. The family apparently pays Dixon's monthly $1,800 child support and $3,000 contractual alimony obligations. Mrs. Dixon agreed she and her family could not pay $1 million cash and provide collateral valued at $3 million. She acknowledged trial expenses were $1.25 million "or more," and agreed this obligation "put a severe financial bind on your ability to continue to pay attorneys' fees, and other things, expert fees" for Dixon. She agreed her family could afford a $100,000 bond and Dixon "personally" lacked the assets to pay the bond. As for property, she agreed Dixon's home, worth approximately $495,000, was encumbered by a lien securing a loan of about that amount.

4

On cross-examination, Mrs. Dixon acknowledged Dixon has an unspecified mineral interest paying "less than $150.00 a month." He is a defendant in a civil lawsuit brought by the Sonnier family but, she testified, none of his assets were placed in trust.

Dixon did not testify at the habeas hearing but his counsel made a statement to the court regarding assets. According to counsel, trusts created by Dixon when he began practicing medicine "have been depleted." Dixon's Sensei Med Spa business occupies leased premises. A Dodge truck and Porsche automobile were sold after Dixon's arrest. He apparently still owns a 1994 Jeep driven by his son and valued at no more than $2,000. Dixon's residence contains furniture, $1,800 cash, and "silver coins."

Dixon offered exhibits admitted during the hearing, which included: documentary proof that in two Lubbock County capital murder cases, one from 2005 and the other from 2012, the 140th District Court set bail at $1 million; a disc containing the testimony from Dixon's trial; and the affidavits of two jurors from Dixon's trial indicating they and other jurors were unwilling to find Dixon guilty of capital murder, murder, or manslaughter. Dixon's passport was also surrendered to the court.

Analysis

Through one issue, Dixon asserts the trial court abused its discretion by refusing to reduce his $10 million bail.

"'Bail' is the security given by the accused that he will appear and answer before the proper court the accusation brought against him, and includes a bail bond or a personal bond." TEX. CODE CRIM. PROC. ANN. art. 17.01 (West 2005). "A 'bail bond' is a written undertaking entered into by the defendant and the defendant's sureties for the

5

appearance of the principal therein before a court or magistrate to answer a criminal accusation . . . ." TEX. CODE CRIM. PROC. ANN. art. 17.02 (West Supp. 2014). The chief purpose of bail is securing the presence of the accused at trial on the offense charged. *See Ex parte Rodriguez,* 595 S.W.2d 549, 550 (Tex. Crim. App. [Panel Op.] 1980).

Setting the amount of bail for an accused is a decision committed to the discretion of the magistrate or court. *See* U.S. CONST. amend. VIII; TEX. CONST. art. I, § 13; TEX. CODE CRIM. PROC. ANN. art. 17.15 (West 2005). A trial court abuses its discretion if it acts without reference to any guiding rules or principles; that is, in an arbitrary or unreasonable manner. *Ex parte Hunt,* 138 S.W.3d 503, 505 (Tex. App.—Fort Worth 2004, pet. refused). A reviewing court will not disturb a ruling of the trial court if it is within the zone of reasonable disagreement. *Clemons v. State,* 220 S.W.3d 176, 178 (Tex. App.—Eastland 2007, no pet.) (per curiam). But an abuse of discretion review is more than merely concluding the trial court did not rule arbitrarily or capriciously. *Ex parte Beard,* 92 S.W.3d 566, 573 (Tex. App.—Austin 2002, pet. refused) (citing *Montgomery v. State,* 810 S.W.2d 372, 392 (Tex. Crim. App. 1990) (op. on reh'g)). Rather the analysis requires the reviewing court to measure the trial court's ruling against the relevant criteria on which the ruling was made. *Id.*

In a habeas case, the applicant bears the burdens of proving facts that would entitle him to relief and ensuring that a sufficient record is presented to show error requiring reversal. *Ex parte Kimes,* 872 S.W.2d 700, 703 (Tex. Crim. App. 1993). Therefore, the burden of proof is on an applicant claiming excessive bail. *Ex parte Rubac,* 611 S.W.2d 848, 849 (Tex. Crim. App. [Panel Op.] 1981); *Milner v. State,* 263 S.W.3d 146, 148 (Tex. App.—Houston [1st Dist.] 2006, no pet.). A reviewing court will

6

not reduce the trial court's bail determination unless the applicant discharges his burden. *Ex parte Gentry,* 615 S.W.2d 228, 231 (Tex. Crim. App. 1981) (reducing bail amount after reviewing court was "completely satisfied that petitioner discharged her burden of showing her entitlement" to bail reduction); *Ex parte Welch,* 729 S.W.2d 306, 310 (Tex. App.—Dallas 1987, no pet.) (holding after considering "all of the evidence and factors relevant to determining the amount of bond," that "applicant has failed to satisfy his burden of showing that the trial court abused its discretion in refusing to lower applicant's bond").

The bail determination requires a court to strike a balance between the presumption of innocence enjoyed by the accused and the State's interest in assuring the accused appears for trial. *Ex parte Beard,* 92 S.W.3d at 573. Excessive bail is prohibited by the federal and state constitutions. *See* U.S. CONST. amend. VIII; TEX. CONST. art. I, § 13. Bail is excessive if it is "set in an amount greater than is reasonably necessary to satisfy the government's legitimate interests." *Ex parte Beard,* 92 S.W.3d at 573.

Exercising its discretion on a request for bail reduction, the trial court considers the following factors:

1. The bail shall be sufficiently high to give reasonable assurance that the undertaking will be complied with.

2. The power to require bail is not to be so used as to make it an instrument of oppression.

3. The nature of the offense and the circumstances under which it was committed are to be considered.

4. The ability to make bail is to be regarded, and proof may be taken upon this point.

5. The future safety of a victim of the alleged offense and the community shall be considered.

TEX. CODE CRIM. PROC. ANN. art. 17.15 (West 2005).

It is said the nature of the offense is a primary consideration in assessing bail. *See Ex parte Durst,* 148 S.W.3d 496, 500 (Tex. App.—Houston [14th Dist.] 2004, pet. refused) (majority op. on reh'g) (citing *Ex parte Rubac,* 611 S.W.2d at 849 ("The primary factors are the length of the sentence and the nature of the offense")); *Aviles v. State,* 26 S.W.3d 696, 698-99 (Tex. App.—Houston [14th Dist.] 2000, pet. refused) ("Two factors should be given great weight when determining the amount of bail: the nature of the offense and the length of the sentence"); *Ex parte Hulin,* 31 S.W.3d 754, 759 (Tex. App.—Houston [1st Dist.] 2000, no pet.) ("The primary factors to be considered in determining what constitutes reasonable bail are the punishment that can be imposed and the nature of the offense"); *see Ex parte Vazquez,* 558 S.W.2d 477, 480 (Tex. Crim. App. 1977) (noting possible punishment is a consideration). Capital murder is punishable by life in prison without parole or death. TEX. PENAL CODE ANN. § 12.31(a) (West Supp. 2014).

As for the ability to make bail, courts have required an accused to show an unsuccessful attempt to make bail before the amount of bail set can be found excessive. Such a showing is not required, however, when the defendant shows that his funds and those of his family have been exhausted. *Milner,* 263 S.W.3d at 149. But the accused's ability to make bail is not controlling; otherwise, "the role of the trial court

in setting bond would be completely eliminated and the accused would be in the position to determine what his bond should be." *Milner,* 263 S.W.3d at 150. "Bail set in an amount that no bondsman could make is not, for that reason alone, excessive." 41 George E. Dix & John M. Schmolesky, TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 21:27 (3d ed. 2011) (citing *Wright v. State,* 976 S.W.2d 815 (Tex. App.—Houston [1st Dist.] 1998, no pet.)).

In order to set bail sufficiently high that the accused will comply with his undertaking, a magistrate gives consideration to matters other than those listed in article 17.15. Dix & Schmolesky at § 21:30. This includes the accused's personal situation. *Id.* Thus courts look to several common law factors including the accused's work record, family and community ties, length of residency, and aggravating circumstances alleged to have been involved in the charged offense. *See Ex parte Rubac,* 611 S.W.2d at 849-50 (listing these along with other factors not applicable here).

The procedural history of this case distinguishes it from most reported cases involving bond reduction appeals. The trial judge who conducted the habeas hearing also presided over Dixon's capital murder trial, and the record of testimony from the trial was presented at the habeas hearing. In particular, this procedural history distinguishes this case from one cited by Dixon, *Ex parte Evans*, which also addressed a bond reduction request after a mistrial caused by a deadlocked jury. *Ex parte Evans*, No. 06-11-000480-CR, 2011 Tex. App. LEXIS 5052 (Tex. App.—Texarkana July 6, 2011, no pet.) (mem. op., not designated for publication). In *Evans*, a visiting judge presided over the mistrial, and the trial evidence presented at the bond reduction hearing was limited. *Id.*, at *7-8. By contrast, in ruling on Dixon's bail-reduction request, the trial judge had

9

before him the capital murder trial evidence as well as the testimony and other evidence presented live at the habeas hearing.[2]   And, in his role as factfinder at the habeas hearing, the trial judge necessarily made weight and credibility determinations. *Ex parte Gandara,* No. 08-10-00234-CR, 2011 Tex. App. LEXIS 9395, at *6 (Tex. App.—El Paso Nov. 30, 2011, no pet.) (mem. op., not designated for publication) ("In a habeas proceeding, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony, and the court may accept some, all, or none of a witness's testimony").   Those determinations may properly have had a bearing on the court's evaluation of the statutory and common law factors for setting bail, including those factors related to the charged offense and the circumstances under which it occurred.[3]

Dixon engaged in the practice of medicine in Amarillo from 2003 until his arrest. At the time of his trial, he was 50 years old.  The current status of his medical license was not shown.  As noted, he owns a mineral interest.  Other than its leased premises, the assets of his spa business are not shown, nor any assets related to his medical practice.  Dixon has no demonstrated ties to Lubbock County.  He has "friends and family" in the Spearman area.  Dixon's three children, ages twenty-six, nineteen and

---

[2] *See Ex parte Green*, No. 02-13-00474-CR 2014, Tex. App. LEXIS 1688, at *1 n.2 (Tex. App.—Fort Worth Feb. 13, 2014, no pet.) (mem. op., not designated for publication) (similar procedural history; in oral pronouncement denying reduction of bail, trial court "stated that it had considered 'all of the evidence previously [introduced at trial]' in making its determination").

[3] In that regard, the State emphasizes the "amount of time [Dixon] and Shepard spent plotting the murder."  But of course Dixon has not been convicted of Sonnier's murder.  Under the evidence at trial, however, it was not disputed the men devoted a significant effort to planning and pursuing their actions directed at Sonnier, whatever their nature.

fifteen, live in Amarillo. His eldest child is married. The nature of Dixon's relationship with his children was not clearly portrayed. These factors related to Dixon's personal situation and ties are essentially undisputed, but, considered individually or together, the trial court could have found them unconvincing as showing "an incentive to remain despite the possibility of conviction and sentence." Dix & Schmolesky at § 21:30.

In this court Dixon places heavy emphasis on Shepard's testimony explaining that he implicated Dixon only to obtain a favorable plea bargain and avoid a possible death penalty case against him. And Dixon emphasizes the two affidavits from jurors stating that as many as six jurors believed he was guilty of nothing but criminal trespass. Here, again, however, determinations of the weight to be given particular testimony and of its bearing on the factors for setting bail were determinations to be made by the trial court. The court was not required to assign to Shepard's trial testimony or the hearsay statements by two jurors the weight Dixon attributes to those items of evidence.

Dixon's evidence presented at the habeas hearing to support his contention he is unable to make bond on the assessed amount of bail was meager. One Lubbock bond company might write a bond, others would not. Further, Dixon's evidence cannot be seen as a serious effort to present his, or his family's, financial condition. His mother testified briefly, and largely in generalities. We agree with the State's assessment that the record does not indicate the extent of Dixon's or his family's "actual remaining resources." In short, Dixon may lack the financial wherewithal to post bond on the assessed $10 million bail, but the hearing record simply does not provide a dependable basis for such a conclusion.

11

From our research, Dixon's bail assessment is among the highest reported in Texas. *See Ex parte Durst,* 148 S.W.3d at 501 (reducing bail from $1 billion per case in three third-degree felony cases to $150,000 per case); *Beard,* 92 S.W.3d at 567, 573-74 (ordering bail of $8 million reduced to $500,000). But, as courts have often recognized, the reported cases are not an effective gauge for our review of the trial court's determination.

> Case law is of relatively little value in addressing the ultimate question of the appropriate amount of bail in a particular case because appellate decisions on bail matters are often brief and avoid extended discussions, and because the cases are so individualized that generalization from results reached in others is difficult.

*Beard,* 92 S.W.3d at 571 (citing 41 George E. Dix & Robert O. Dawson, TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 16.51 (2d ed. 2001) (quotation marks omitted)).

## Conclusion

Given the grave nature of the offense with which he is charged and the potential sentence on conviction, *Ex parte Rubac,* 611 S.W.2d at 849, on the record we are presented, we cannot say the habeas judge abused his discretion by finding Dixon failed to carry his burden to show his entitlement to a bail reduction. We affirm the court's order denying Dixon's requested bail reduction.

Per Curiam

Do not publish.

12