Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio



## OPINION

No. 04-11-00447-CR

**EX PARTE** Mark Anthony **GONZALEZ**

From the 175th Judicial District Court, Bexar County, Texas
Trial Court No. 2011CR5289
Honorable Andrew W. Carruthers, Judge Presiding[1]

Opinion by:    Marialyn Barnard, Justice
Concurring Opinion by:  Rebecca Simmons, Justice

Sitting:        Karen Angelini, Justice
                Rebecca Simmons, Justice
                Marialyn Barnard, Justice

Delivered and Filed:  February 29, 2012

AFFIRMED

This is an accelerated appeal from the trial court's order denying Mark Anthony

Gonzalez's application for writ of habeas corpus seeking a reduction in bail.  We affirm.

### BACKGROUND

Gonzalez is charged with capital murder, specifically the murder of Sergeant Kenneth

Vann of the Bexar County Sheriff's Department.  Gonzalez's bail was set at $1,500,000.00.

Gonzalez filed an application for writ of habeas corpus, seeking to reduce the amount of his bail.

---

[1] This cause is pending in the 175th Judicial District Court, Bexar County, Texas, in which the Honorable Mary Roman is the presiding judge.  However, the hearing on the application for writ of habeas corpus was conducted by the Honorable Andrew W. Carruthers, Criminal Law Magistrate, pursuant to an order of referral.

After an evidentiary hearing, the trial court denied the request for bail reduction and Gonzalez perfected this appeal.

## ANALYSIS

On appeal, Gonzalez raises three issues, contending the trial court erred in refusing to reduce his bail and that the refusal violated his constitutional right to reasonable bail. More specifically, he claims the trial court's refusal to reduce his bond violated his rights under Article I, sections 11 and 13 of the Texas Constitution and the Eighth and Fourteenth Amendments of the United States Constitution.

### *Standard of Review*

A trial court's pretrial bail determination is reviewed for an abuse of discretion. *Ex parte Rubac*, 611 S.W.2d 848, 850 (Tex. Crim. App. [Panel Op.] 1981); *Ex parte Anunobi*, 278 S.W.3d 425, 428 (Tex. App.—San Antonio 2008, no pet.). A trial court abuses its discretion when it acts without reference to any guiding rules or principles, i.e., in an arbitrary and unreasonable manner. *Ex parte Hunt*, 138 S.W.3d 503, 505 (Tex. App.—Fort Worth 2004, pets. ref'd) (citing *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). Merely because we might decide a matter differently than the trial court did does not demonstrate an abuse of discretion. *Id.* It is the appellant's burden to demonstrate the bail set by the trial court is excessive. *Rubac*, 611 S.W.2d at 849; *Anunobi*, 278 S.W.3d at 428.

The purpose of pretrial bail is to secure the defendant's appearance at trial. *Ex parte Rodriguez*, 595 S.W.2d 549, 550 (Tex. Crim. App. [Panel Op.] 1980); *Anunobi*, 278 S.W.3d at 427. Bail should not be used as an instrument of oppression, and excessive bail is prohibited by our state and federal constitutions, as well as the Texas Code of Criminal Procedure. *Ex parte Ivey*, 594 S.W.2d 98, 99 (Tex. Crim. App. [Panel Op.] 1980); U.S. CONST. amends. VIII, XIV;

TEX. CONST. art. I, §§ 11, 13; TEX. CODE CRIM. PROC. ANN. art. 17.15 (West 2005). Bail determinations are "bounded and guided by our state and federal constitutions and state law." *Ex parte Estrada*, Nos. 04-08-00596-CR, 04-08-00597-CR, & 04-08-00598-CR, 2008 WL 4958370, at *1 (Tex. App.—San Antonio Nov. 19, 2008, no pet.). The Texas Legislature has provided a framework for pretrial bail considerations:

1. The bail shall be sufficiently high to give reasonable assurance that the undertaking will be complied with.

2. The power to require bail is not to be so used as to make it an instrument of oppression.

3. The nature of the offense and the circumstances under which it was committed are to be considered.

4. The ability to make bail is to be regarded, and proof may be taken upon this point.

5. The future safety of a victim of the alleged offense and the community shall be considered.

TEX. CODE CRIM. PROC. ANN. art. 17.15. Other relevant factors include: (1) the nature of the offense and possible sentence; (2) the defendant's ties to the community–including family ties, (3) length of residency; (4) employment history; (5), prior criminal record; (6) the existence of other bonds against the defendant and his compliance with conditions of those bonds; and (7) aggravating factors involved in the alleged offense. *Rubac*, 611 S.W.2d at 849-50.

### *Application*

Gonzalez, who bore the burden of proof to establish he was entitled to a reduction in bond, presented one witness, his cousin, Gloria Medrano. Medrano testified Gonzalez was born and raised in San Antonio and has lived in San Antonio his whole life. She stated Gonzalez, before his arrest, was employed as an aircraft mechanic. Medrano claimed to be unaware of any plans by Gonzalez to leave Bexar County, but knew Gonzalez had no passport. Medrano

testified, as far as she knew, that when Gonzalez was in trouble before, he "never had a problem showing up" for court.

As to his ability to make the $1,500,000.00 bail in this case, Medrano testified the bonding company required a payment of $150,000.00 before it would post bail. Medrano stated family attempted to come up with the money requested by the bonding company, but the family did not have the money "that she [knew] of." She testified the family would only be able to make a bond of $50,000.00. Medrano did not know whether Gonzalez's wife was employed, nor did she have information about the assets owned by Gonzalez and his wife. She did state, however, she was sure the family could not afford the bail as currently set.

On cross-examination by the State, Medrano admitted she had no idea how much money Gonzalez and his wife had in their accounts, and did not know how much money Gonzalez's wife earned. She also did not know whether Gonzalez and his wife owned their home, but stated they had lived there at least fifteen years. She stated she was unfamiliar with the finances of the immediate family and just assumed they would not be able to make the current bail because she did not know them to have "a lot of money," no "nice cars or fancy house[s]." Medrano's testimony does not establish Gonzalez could not afford the bail set by the trial court. Rather, this evidence merely showed Gonzalez did not have bond money "that she [knew] of." In actuality, the witness was wholly unaware of the Gonzalez family finances. Accordingly, it cannot be said the trial court abused its discretion when in an attempt to meet his burden, Gonzalez presented evidence from someone that actually was unfamiliar with his family's financial situation.

Medrano admitted she did not know whether Gonzalez might flee or not. Medrano did state she knew Gonzalez's grandmother had owned a home in Mexico and that upon her death,

the house passed to Gonzalez's mother and that he had helped his mother work on the house. She did not know, however, if Gonzalez's mother still owned the house.

After presenting Medrano as his sole witness, Gonzalez rested. The State then noted its objection to any reduction in the amount of bail, and introduced several documents into evidence. The first document was the arrest warrant affidavit, which describes the events leading up to Sergeant Vann's death. The affidavit avers that Sergeant Vann was in uniform, sitting in his marked patrol car at a red light. While sitting at the red light, Sergeant Vann was shot numerous times and killed. A witness, John Vrzalik, told officers that he heard shots being fired and it lasted for approximately thirty seconds. He saw the patrol car slowly pass into the intersection after the shots, and saw a blue 2010 or 2011 Ford F150 "speed away."

The affidavit also contains information from a confidential informant, who told officers he has known Gonzalez for more than twenty years, and on the night Sergeant Vann was killed, he met with Gonzalez at a rural location where Gonzalez was having another individual "do some tire work" on his truck, which the informant identified as a blue Ford F150. While the tire work was being done, the informant saw Gonzalez remove an M&P 15 from his truck–Gonzalez and the person performing the "tire work" proceeded to fire the weapon at a fence post. Gonzalez was noted to have a one hundred round magazine for the weapon. After the tire work was completed, there was a minor vehicle collision between informant and Gonzalez–after the collision, they planned to meet at a Denny's restaurant. However, when they were approaching the restaurant, the informant turned into the parking lot, but Gonzalez pulled up next to Sergeant Vann's patrol car. Thereafter, the informant heard "several pops." Gonzalez never showed up at the restaurant, but while the informant was still at the restaurant, Gonzalez called him and stated, "I killed a cop. Don't tell no one, not even your wife."

The informant was also able to identify Gonzalez's home, which is owned by Gonzalez's wife and consists of 2.5 acres. He also saw two vehicles parked at the location that he knew Gonzalez owned–a Mustang Cobra and a tractor trailer. The informant also told officers that in addition to the M&P 15, Gonzalez has numerous other weapons in a gun safe in his bedroom. The affiant stated the ammunition used to kill Sergeant Vann was identified as .223 caliber ammunition, and the affiant is aware that the M&P 15 "shoots .223 caliber ammunition."

The State also introduced into evidence documents establishing Gonzalez had been arrested multiple times during his life for offenses including: (1) unlawfully carrying a weapon (twice), (2) resisting and evading arrest, (3) driving while intoxicated, (4) burglary of a vehicle, (5) carrying a fictional driver's license, and (6) driving with an invalid license. All of these cases were ultimately closed–they were either dismissed, Gonzalez was found not guilty, or Gonzalez completed deferred adjudication or probation.

The State introduced, and the trial court admitted into evidence, the firearms transaction record establishing Gonzalez's wife purchased the M&P 15 in 2007. This record established Gonzalez's wife was born in Mexico. The State also introduced the forensic firearms report that showed four weapons and a large quantity of ammunition had been seized from Gonzalez's home. That report also established that bullets from an M&P 15 were used to kill Sergeant Vann.

The State also introduced documents showing Gonzalez's work history. The documents show Gonzalez has worked in Alabama, Georgia, Kansas, Arizona, and in two other cities in Texas, Dallas and Port Isabel. A resume prepared by Gonzalez was included, showing his address in Laredo, Texas, not San Antonio. Additionally, a personal information sheet lists an address for Gonzalez in South Carolina.

An affidavit from Stephen Starling revealed him to be the confidential informant mentioned in the arrest warrant affidavit, and in his affidavit Starling averred he knew Gonzalez had worked out of town and outside Texas over the years. It was his understanding Gonzalez had been out of the state since 2009. Starling expressed fear that he and his family would be in "grave danger" if Gonzalez were released given that Starling was the individual who reported Gonzalez to authorities. Starling stated his fear of Gonzalez, given his love of guns and the murder of Sergeant Vann, kept Starling from reporting what he knew for an entire week. He advised that Gonzalez knows where he lives, and that even his eleven-year-old daughter is worried Gonzalez might come to their house.

Finally, the State presented an affidavit from one of the investigators in the case. The investigator stated in his affidavit that during the course of his investigation he had learned Gonzalez had "recently applied for a job in Mexico and also applied for an expedited passport through the [I]nternet." Gonzalez never obtained the passport because he failed to provide all the necessary information. The investigator stated he had spoken to Gonzalez's mother and she told him she owns a home in Mexico, which she currently rents out, and she still has family in Mexico.

Having determined the relevant factors to be considered, and having reviewed the evidence adduced at the habeas corpus hearing, we must now determine if the trial court abused its discretion in refusing to reduce Gonzalez's bail.

This court has considered whether bail of $1,000,000.00 in a capital murder/burglary case was excessive. *Estrada*, 2008 WL 4958370, at *1. In our review, we noted an absence of reported Texas cases sustaining bail in the amount of $1,000,000.00 "even in the most egregious capital murder cases." *Id.* at *3 (citing *Ex parte Beard*, 92 S.W.3d 566 (Tex. App.—Austin

2002, pet. ref'd) ($8,000,000.00 bail reduced to $500,000.00); *Ex parte Henson*, 131 S.W.3d 645 (Tex. App.—Texarkana 2004, no pet.) ($750,000.00 bail for each of three counts of capital murder reduced to $500,000.00 for each count); *Ex parte Simpson*, 77 S.W.3d 895 (Tex. App.— Tyler 2002, no pet.) ($1,000,000.00 bail reduced by trial court to $600,000.00 held not excessive); *Ex parte McDonald*, 852 S.W.2d 730 (Tex. App.—San Antonio 1993, no pet.) ($1,000,000.00 bail reduced to $75,000.00)).  We did recognize, however, bail in the amount of $1,000,000.00 was appropriate when circumstances established such bail was justified.  *Estrada*, 2008 WL 4958370, at *3 (citing *Ex parte Saldana*, No. 13-01-00360-CR & 13-02-00361-CR, 2002 WL 91331 (Tex. App.—Corpus Christi Jan. 24, 2002, no pet.) (not designated for publication) (upholding $1,000,000.00 bail where defendant had numerous prior convictions and arrests for violent crime, defendant demonstrated ability to post $500,000.00 bond before indictment, defendant's gang ties, and danger to key witness), *overruled in part on other grounds*, *Ramos v. State*, 89 S.W.3d 122, 126 (Tex. App.—Corpus Christi 2002, no pet.); *Ex parte Brown*, No. 05-00-00655-CR, 2000 WL 964673 (Tex. App.—Dallas Jul. 13, 2000, no pet.) (not designated for publication) (upholding $1,000,000.00 bail when uncontroverted evidence showed defendant posed threat to estranged wife and failed to produce any evidence of ties to community or ability to make bail).

Although we found the $1,000,000.00 bond in *Estrada* to be excessive and reduced it to $600,000.00, we hold the facts in *Estrada* are distinguishable–although similarly egregious.  *Id.* at *4.  In *Estrada*, the defendant, a young man with a troubled past, broke into the home of a long-time neighbor to commit burglary.  2008 WL 4958370, at *2.  The neighbor awoke during the burglary and Estrada shot her in the head with a bow and arrow he brought with him.  *Id.*  He then left the home, taking the victim's vehicle and credit cards.  *Id.*  Estrada drove to a gas

station, filled a container with gasoline, returned to the victim's home, and set fire to the victim and her home. *Id.* He later used the victim's credit cards to purchase hair gel, clothing, and computer equipment. *Id.*

At the bond hearing, Estrada's father testified, noting his son's age and the fact that he lived with his parents before the murder. *Id.* The father testified that if Estrada was released on bond, he would live with his parents in the family home. *Id.* The father swore to the trial court that "he would do everything in his power to ensure Estrada appeared in court and meet any conditions of the bond." *Id.* He went so far as to say that Estrada's mother would stop working to be at home during the day with Estrada. *Id.* The father noted the family had no ties to Mexico and had only left the state of Texas one time on a family vacation to Arizona and Nevada.

As to finances, the father testified his son is financially dependent on them and "could not post a bond in any amount," owns no property, and has no assets. The father specifically stated he had contacted at least five bail bond companies and could not meet the financial conditions imposed by any of them.

Thus, in *Estrada*, with regard to the nature of the offense, the defendant broke into the home of someone he knew for a defined purpose, burglary. Only when the victim awoke, interrupting the burglary, did the defendant become violent. His actions after that point, while egregious, were to cover up the offense. Thus, while the nature of the offense was egregious, there was at least some explanation for the defendant's violent acts. As to appearing if bond were reduced, the father provided in-depth testimony that he would assure Estrada's appearance and how it would be done, and unlike Gonzalez, noted his son's lack of contacts with Mexico or any other jurisdiction. The father also affirmatively stated, unlike the financial witness for

Gonzalez, the attempts made by the family to secure bond and definitively stated the family's inability to post the bond as set.

In this case, however, the reason for the brutal offense is seemingly inexplicable, suggesting a danger to the community that did not exist in *Estrada*. And although, just as in *Estrada*, there are factors that militate in favor of a bail reduction–Gonzalez's ties to the community and apparent compliance with probation and deferred adjudication terms for past offenses–there are many factors that did not exist in *Estrada* that suggest bail in the amount of $1,500,000.00 is not excessive and is justified under the circumstances, such a paucity of testimony of Gonzalez's ability to make the bond set, his clear connections to a foreign country and knowledge of other states where he has worked, and a failure of any witness to attempt to guarantee his appearance. The concurrence asserts we have distinguished *Estrada* based only on the fact that Estrada killed his victim when he was discovered burglarizing her home, whereas Gonzalez allegedly committed a murder at random. Concurrence at p. 3 ("But the majority's reasoning that Gonzalez's alleged unprovoked killing of a random sheriff's deputy in his car supports a bail two and one-half times greater than Estrada's—for killing his elderly neighbor in her own home with an arrow through the head—is not persuasive."). However, this was not the sole basis for our distinction. Rather, as noted above, there are *many* factors that did not exist in *Estrada* that exist in this case, which militate against a finding that the trial court abused its discretion here. These factors include: the absence of evidence concerning Gonzalez's ability to make the bond, his connections to a foreign country and knowledge of other states where he has worked, and a failure of any witness to attempt to guarantee his appearance. Finally, it is important to note that in *Rubac*, the court of criminal appeals specifically advised that a factor to be included in determining the amount of bond is the aggravating factors involved in the offense.

*Rubac*, 611 S.W.2d at 849-50. Accordingly, the random and inexplicable nature was a factor to be considered by the court, and does provide a valid distinction from the *Estrada* decision. For these reasons, our distinction of *Estrada* is compelling.

The concurrence seems to find Gonzalez's connections to Mexico of little import. However, we find it significant that Gonzalez's mother still owns the house in Mexico, Gonzalez worked on the house, has relatives in Mexico, and applied for an expedited passport.

In addition to placing little reliance on the evidence concerning Gonzalez's ties to Mexico, his extensive out-of-state work history, and his possession of firearms, the concurrence does not address the testimony of the confidential informant, Starling, a former friend of Gonzalez's who was with him on the night of the murder. Starling provided evidence that Gonzalez had been out of the state since 2009. Moreover, he expressed fear that he and his family would be in "grave danger" if Gonzalez were released. Starling specifically stated that his fear of Gonzalez, given his love of guns and the murder of Sergeant Vann, kept Starling from reporting what he knew for an entire week. He advised that Gonzalez knows where he lives, and that even his eleven-year-old daughter is worried that Gonzalez might come to their house. Starling's fear about his future safety is another valid and important factor to be considered by the trial court. *See* TEX. CODE CRIM. PROC. ANN. art. 17.15.

As we noted above, we consider the random, inexplicable, and excessively violent murder of a police officer in his patrol car stopped at a stoplight to be egregious. Then, there is Gonzalez's penchant for guns, and his wife's apparent willingness to purchase guns for him. Gonzalez's family has strong connections to Mexico, and he recently applied for work in Mexico and for an expedited passport. Gonzalez has a long, but sporadic, out-of-state work history. He also has several prior criminal offenses. Importantly, there is an absence of evidence as to

Gonzalez's financial condition–other than his cousin's broad statements that she believed the family could not make bail as currently set, which were undermined by her admission on cross-examination that she really had no knowledge of the family's financial condition. Moreover, in this case there is an informant who, along with his young daughter, fears reprisal in the event Gonzalez is released.

The concurrence reviews numerous other cases, to "show[] the bail amount in this case could be called into question had there been more evidence of Gonzalez's resources." However, we simply apply the standard of review, we do not conduct a comparative analysis, but strictly review the evidence in light of the statutory and case law factors and determine if the trial court acted without reference to guiding principles of law. Given the evidence in this case and that the burden was on Gonzalez, we cannot say the trial court acted without reference to the legal framework governing decision on bond reductions.

Based on our analysis, and strictly adhering to the proper standard of review, we hold the trial court did not abuse its discretion in refusing to reduce Gonzalez's bond in the amount of $1,500,000.00. Gonzalez did not meet his burden of proof to establish the amount of bond is excessive.

## CONCLUSION

Based on the foregoing, we hold the trial court did not abuse its discretion in refusing to reduce Gonzalez's bond. We therefore affirm the trial court's order denying Gonzalez's request for a bail reduction.

Marialyn Barnard, Justice

Publish