FILED IN
COURT OF CRIMINAL APPEALS

June 19, 2015

ABEL ACOSTA, CLERK

PD-0398-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 6/18/2015 6:52:18 PM
Accepted 6/19/2015 8:54:41 AM
ABEL ACOSTA
CLERK

# NO. PD-0398-15

In the
## Court of Criminal Appeals
for the
## State of Texas

---

### No. 07-14-00433-CR
In the Court of Appeals for the
Seventh District of Texas

---

### No. 2012-435,942
In the 140th District Court
of Lubbock County, Texas

---

## EX PARTE
## THOMAS MICHAEL DIXON
*Petitioner-Appellant*

---

### BRIEF ON THE MERITS

---

**DANIEL W. HURLEY**
Tex. SBN 10310200
**FRANK SELLERS**
Tex. SBN 24080305
**AARON R. CLEMENTS**
Tex. SBN 00795861
Email: aaronrc@swbell.net
Hurley, Guinn & Sellers
1805 13th Street
Lubbock, Texas 79401
(806) 771-0700 phone
(806) 763-8199 fax

**SELDEN HALE**
Attorney at Law
310 Southwest 6th Avenue
Amarillo, Texas 79101
(806) 372-5711 phone
(806) 372-1646 fax

ATTORNEYS FOR APPELLANT

ORAL ARGUMENT WAIVED

IDENTITY OF JUDGES, PARTIES & COUNSEL

| | |
|---|---|
| **Trial Court Judge:** | Hon. Jim Bob Darnell |
| | 140th District Court of Lubbock County, Texas |

**Trial Court Judge:** Hon. Jim Bob Darnell
140th District Court of Lubbock County, Texas

**Petitioner-Appellant:** Thomas Michael Dixon
**Trial and Appellate Counsel:** Daniel W. Hurley
Frank Sellers
Aaron R. Clements (appellate only)
Hurley, Guinn & Sellers
1805 13th St.
Lubbock, Texas 79401
(806) 771-0700
(806) 763-8199 fax

Selden Hale
310 Southwest 6th Avenue
Amarillo, Texas 79101
(806) 372-5711
(806) 372-1646 fax

**Respondent-Appellee:** The State of Texas
**Trial Counsel:** Hon. Matt Powell
Lubbock County Criminal District Attorney
Sunshine Stanek, Ass't District Attorney
Wade Jackson, Ass't District Attorney
Lauren Murphree, Ass't District Attorney
**Appellate Counsel:** Jeff Ford, Ass't District Attorney
Lauren Murphree, Ass't District Attorney
Wade Jackson, Ass't District Attorney
Lubbock County District Attorney's Office
P.O. Box 10536
Lubbock, Texas 79408-0536

State Prosecuting Attorney's Office
P.O. Box 13406
Austin, Texas 78711-3046

i

# TABLE OF CONTENTS

IDENTITIES OF JUDGES, PARTIES, & COUNSEL................................................i

TABLE OF CONTENTS................................................................................ ii

INDEX OF AUTHORITIES...........................................................................iv

STATEMENT OF THE CASE.........................................................................1

STATEMENT REGARDING ORAL ARGUMENT ...........................................2

ISSUE PRESENTED....................................................................................2

STATEMENT OF FACTS .............................................................................3

SUMMARY OF THE ARGUMENT ................................................................7

ARGUMENT AND AUTHORITIES...............................................................10

    A.    Standard of Review .........................................................10

    B.    Factors for Determining Reasonable Bail ...........................11

    C.    The Court of Appeals' Decision........................................14

    D.    Proper comparison of the bail amount in this case to those set in previous capital murder cases gives rise to an inference that bail in this case is excessive and oppressive. ..................................................................15

    E.    Comparison of the facts of this case measured against all of the criteria for setting of bail, in light of the bail deemed appropriate in other capital cases, reveals that the trial court abused its discretion and that the Court of Appeals erred in holding otherwise.....................................17

    F.    The bail amount set in this case has the effect of operating as an instrument of oppression.............................24

CONCLUSION AND PRAYER ...............................................................27

CERTIFICATE OF SERVICE ...............................................................28

CERTIFICATE OF COMPLIANCE...........................................................28

# INDEX OF AUTHORITIES

**CASES**                                                                      **PAGE**
TEXAS

*Balboa v. State*, 612 S.W.2d 553 (Tex.Crim.App. 1981) .......................................11

*Ex parte Barrera*, 2000 WL 280448 (Tex. App. – Houston [1st Dist.] 2000) .........10

*Ex parte Beard*, 92 S.W.3d 566 (Tex. App. – Austin 2002, pet. ref'd)............passim

*Ex parte Davis*, 147 S.W.3d 546 (Tex. App. – Waco 2004) ..................................19

*Ex parte Estrada*, 398 S.W.3d 723 (Tex. App. – San Antonio 2008, no
    pet.) ................................................................................................16, 18

*Ex parte Gonzalez*, 383 S.W.3d 160 (Tex. App. – San Antonio 2012,
    pet. ref'd) ...........................................................................10, 16-18, 20-21

*Ex parte Harris*, 733 S.W.2d 712 (Tex. App. – Austin 1987, no pet.)....................13

*Ex parte Henson*, 131 S.W.3d 645 (Tex. App. – Texarkana 2004).............12, 18, 25

*Ex parte Ivey*, 594 S.W.2d 98 (Tex. Crim. App. 1980) ...................................12, 25

*Ex parte Milburn*, 8 S.W.3d 422 (Tex. App. – Amarillo 1999) .......................11, 13

*Ex parte Reyes*, 4 S.W.3d 353 (Tex. App. – Houston [1st Dist.] 1999)...................10

*Ex parte Rodriguez*, 595 S.W.2d 549 (Tex. Crim. App. 1980) ..............................12

*Ex parte Rubac*, 611 S.W.2d 848 (Tex. Crim. App. 1981) (panel op.) .............10, 13

*Ex parte Scott*, 122 S.W.3d 866 (Tex. App. – Fort Worth 2003, no pet.) ......... 11-12

*Ex parte Vasquez*, 558 S.W.2d 477 (Tex. Crim. App. 1977) .................................12

*In re Durst*, 148 S.W.3d 496 (Tex. App. – Houston [14th Dist.] 2004,
    no pet.) (op. on reh'g) .........................................................................13, 24

*Ludwig v. State*, 812 S.W.2d 323 (Tex. Crim. App. 1991)................................13, 16

*Maldonado v. State*, 999 S.W.2d 91 (Tex. App. – Houston [14th Dist.] 1999) .......10

*Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App. 1991) (op. on reh'g)......11

**CONSTITUTIONAL PROVISIONS**

U.S. CONST. AMEND. VIII ........................................................................................11

U.S. CONST. AMEND. XIV ........................................................................................11

TEX. CONST. ART. I, § 11 ........................................................................................11

TEX. CONST. ART. I, § 13 ........................................................................................11

**STATUTES**

TEX.CODE CRIM.PROC. ANN. ART. 17.01 (Vernon 2013)..........................................11

TEX. CODE CRIM. PROC. ANN. ART. 17.15 (Vernon 2013) ...............................passim

## STATEMENT OF THE CASE

Appellant Thomas Michael Dixon was arrested on July 16, 2012, and charged with capital murder. (3 RR 4: DX 1)[1]. His bail was set at $10,000,000, an amount beyond his ability to meet. *Id.* Dixon was subsequently indicted for two counts of capital murder alleging that he hired a third party to kill the boyfriend of Dixon's former romantic interest.

Dixon's trial began on October 27, 2014. (CR 8). After three weeks of evidence, the jury was unable to reach a verdict and the trial court declared a mistrial. *Id.*

On December 10, 2014 (almost two and a half years after his original arrest), Dixon filed a writ of habeas corpus seeking a bond reduction, challenging his continued incarceration pending trial. *Id.* at 5 After a hearing on December 17, 2014, the trial court refused to reduce Dixon's bail. (*Id.* at 15). The Court of Appeals upheld the trial court's decision on March 6, 2015. This Court granted Dixon's Petition for Discretionary Review on June 3, 2015, and this proceeding follows.

---

[1] Citations to the record appear as follows:
**Writ Hearing**—Reporter's Record: __ RR __; Defense Exhibit: DX __.
**Clerk's Record:** CR __.
**Original Trial Transcript:** __ TR __, where the first blank represents the day of trial and the second blank the transcript page. All citations to the original trial come from DX 14 offered at the writ hearing. The writ hearing exhibit volume lists this as a State's Exhibit that was provided to the Court of Appeals.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is waived in order to expedite consideration of this case by the Court.

## ISSUE PRESENTED

Is a bail amount of ten million dollars, almost seven times larger than any previously approved in a capital case in this state and over three times larger than any approved in any case in this state, greater than reasonably necessary to secure the attendance at trial of an accused who has spent three years in jail (including a mistrial based on the jury's failure to agree on a verdict), has no remaining personal net worth, has strong ties to the Panhandle region of Texas and few ties elsewhere, has no criminal history, is not alleged to have personally participated in any violent act, and has offered to submit to additional conditions designed to secure his attendance at trial?

In his application for writ of habeas corpus filed with the trial court, Appellant Thomas Michael Dixon (hereinafter "Dixon" or "Appellant") asserted that the amount of bail set at ten million dollars to secure his release from custody pending retrial was both excessive and oppressive and should be reduced. (CR 5-7). At the habeas hearing, Dixon submitted the reporter's record of the underlying mistrial along with affidavits from two jurors as to the degree of split within the jury which resulted in that mistrial. (3 RR 17: DX 14). The underlying trial record reflects that David Shepard killed Lubbock pathologist Joseph Sonnier, and the State attempted to show that Dixon paid Shepard to do so because of Dixon's jealousy over Sonnier's relationship with Dixon's former girlfriend, Richelle Shetina. Slip Op. at 2. While Shepard pled guilty to capital murder for hire in exchange for a life sentence, he testified at trial that Dixon never asked nor paid Shepard to kill Sonnier, and that he pled guilty solely to avoid the death penalty. *Id.* Dixon additionally testified in his own defense that he sought to obtain evidence of Sonnier's infidelity in an effort to prove such infidelity to Shetina, and that Shepard's murder of Sonnier was an independent act never contemplated or asked for by Dixon. *Id.* at 2-3.

Dixon offered testimony of a Lubbock County bail bondsman, Ken Herzog, who testified that he would not be able to write such a bond, and that even if he

3

could, the requirements for payment would themselves be onorous, including a cash payment of one million dollars plus collateral to secure a substantial portion of the bond. (2 RR 10).

Dixon's mother additionally testified. She noted that Dixon was born and raised in Spearman, Texas, to a family with roots in the original Spearman settlers and that Dixon still has family and friends there. (2 RR 18-19). She added that he has deep ties to the Amarillo area, with his house, his former medical practice, and a break-even spa business located there, and with three children who all live in Amarillo. (2 RR 19-20, 28). Mrs. Dixon also noted that she contacted all of the bonding companies in Lubbock in an effort to secure Dixon's pretrial release, and that the only one willing to write Dixon's bond required a one million dollar down payment in cash and collateral of at least three million dollars, an amount beyond not only Dixon's means, but that of his family as well. (2 RR 23-24).

Mrs. Dixon also testified that she was familiar with Dixon's finances, and that said finances and assets were essentially depleted. Since his arrest, Dixon has had no income. (2 RR 21). Mrs. Dixon noted that while Dixon owns a home in Amarillo, it is encumbered for approximately the full market value. (2 RR 25-27). Dixon also proffered that while he at one time had a several cars and a trust fund possessing substantial assets, those assets had been liquidated and used in payment of his trial expenses, which were substantially larger than one million dollars. (2

RR 24, 34). Mrs. Dixon added that Dixon had outstanding mortgage obligations as well as contractual alimony and child support payments totaling approximately $7,800 per month which were being covered by herself and Dixon's sister. (2 RR 25). Mrs. Dixon noted that he is the beneficiary of an oil trust, but that the amounts Dixon realizes from that trust are in any case less than $150 per month, with the most recent check being for a substantially lesser amount. (2 RR 29-30). Dixon proffered that his only other assets are approximately $1,800.00 in cash and a collection of silver coins. (2 RR 30). Finally, Mrs. Dixon advised the trial court that Dixon was willing to submit to electronic monitoring as a condition of his release, and Dixon surrendered his passport to the court. (2 RR 17, 28).

Dixon also offered a number of previous Lubbock County capital murder indictments which reflected the bond amounts in each case. Those exhibits reflected that the highest bonds previously set in Lubbock County were for one million dollars. (3 RR 6: DX3; 3 RR 14: DX 11).

The State declined to offer any evidence other than that elicited via cross examination, but essentially argued via insinuation that since Dixon's family had paid over a million dollars in his defense at trial, that Dixon and/or his family must have substantial additional resources, and that for this reason, his bond should remain ten times as high as any previously set in Lubbock County. (2 RR 35). Despite this lack of countervailing evidence and a showing that the bail amount set

was an order of magnitude greater than any previous set in Lubbock County (not to mention that it was an order of magnitude greater than any previously-approved bail in a capital case in this State), the trial court nevertheless denied relief. (2 RR 37; CR 15). The trial court specifically stated that its reason for refusing to reduce the bond amount was "because of the fact that he's charged with capital murder and still facing the possibility of life in the penitentiary without parole, and even the possibility of the death penalty," specifically giving that factor sole consequence and disregarding other statutory and common law factors. (2 RR 36).

6

## SUMMARY OF THE ARGUMENT

Even taking into consideration the deferential abuse of discretion standard, the trial court abused its discretion (and the Court of Appeals erred by sanctioning that abuse) by refusing to reduce its earlier ten million dollar bail in this case, citing to the nature of this case as a capital case potentially involving the death penalty as the trial court's justification.

Bail must be set in an amount which with reasonably assure the defendant's attendance at trial; bail set higher than this amount is excessive, and bail set so high that it guarantees attendance by keeping a defendant incarcerated is oppressive. TEX.CODE CRIM.PROC. ART. 17.15 provides statutory guidance for factors courts should take into consideration in setting bail; additionally, several common law/constitutional factors should be considered. While some factors – particularly the nature of the crime alleged and the possible punishment – may have higher importance than others, no one factor is dispositive. Additionally, inability to make a given bail does not necessarily indicate that such bail is unreasonable, but by the same token, ability to make a given bail does not justify setting it at such a level. The question is what bail would reasonably assure attendance, and this zone of reasonableness may be further defined by looking to prior bail amounts for similar cases.

In the case at bar, the trial court erred by focusing solely on the "nature of the crime" factor, and the Court of Appeals sanctioned this error by determining that the trial court had broad discretion to ignore evidence counter to its determination and that prior bail amounts have no bearing on defining the "zone of reasonableness." The trial court thus determined that it would not reduce the ten million dollar bail set in this case – the highest ever approved by an appellate court in Texas in any case by a factor of more than three, and the highest capital bail approved in this state by a factor of almost seven. This departure from prior reasonable bail amounts itself strongly suggests an abuse of discretion, if not allows a direct inference that the bail amount was set in an amount calculated to be oppressive. The determination by the Court of Appeals that the defendant did not prove the current bail amount to be excessive was therefore erroneous, and should be reversed.

Additionally, the evidence presented demonstrated that while Dixon has been charged with capital murder-for-hire, the strength of the State's case was relatively weak (as evidenced, in part, by the mistrial in this case and juror statements following the mistrial). Also, even assuming *arguendo* that the State's allegations are accurate, Dixon is not alleged to have personally engaged in violence. Furthermore, Dixon presented evidence that after spending resources necessary to defend himself to date, his personal resources are exhausted, and that

the resources available to him from his family (who have been bankrolling his defense) have dwindled as well, leaving Dixon unable to hire a bondsman, even if one were able and willing to make such a high bail amount. Dixon also demonstrated his strong ties via family and employment to the Texas Panhandle region, his lack of a criminal history of any sort, and that he constitutes no danger to the victim (who is beyond harm) or to the community at large. Dixon also offered to submit to conditions which reduce, if not eliminate, any flight risk he might otherwise pose, including the surrender of his passport and willingness to undergo electronic monitoring.

In addition to the bail amount approved by the Court of Appeals in this case giving rise to an inference of excessiveness by being substantially higher than any prior record (much less normal) appellate-approved bail amount in this State, comparison of the foregoing facts of this case to (1) the facts of the previous record-high capital murder bail and to (2) the facts of the closest analogous case lead to the conclusion that the trial court abused its discretion in setting an eight-figure bail amount, and that the Court of Appeals erred by sanctioning this abuse of discretion.

## ARGUMENT AND AUTHORITIES

This case arises from the Court of Appeals' sanctioning of the trial court's denial of relief on Appellant Thomas Michael Dixon's application for writ of habeas corpus. That writ challenged the ten million dollar bail set by the trial court in the underlying capital murder allegation against Dixon – currently the highest bail amount ever approved by an appellate court in the State of Texas,[2] and an amount almost seven times greater than the previous record in a capital case of $1,500,000, set in 2012. *Ex parte Gonzalez*, 383 S.W.3d 160 (Tex. App. – San Antonio 2012, pet. ref'd.). For the following reasons, the lower courts' rulings are in conflict with precedents of this Court and other courts of appeals, and represent such a departure from the usual course of judicial proceedings that this Court's intervention is warranted.

### A.     Standard of Review

An appellate court's review of a trial court's decision on a request for reduction of bail is reviewed for abuse of discretion. *Ex parte Rubac*, 611 S.W.2d

[2]     The highest approved bail amounts in Texas have been in major controlled substance trafficking cases, which courts have recognized as "unique" because of the nature of such offenses, which require participants and assets to be highly mobile and which involve large amounts of cash, suggesting "monied backers who may consider the cost of bail as a normal business expense." *Maldonado v. State*, 999 S.W.2d 91, 96 (Tex. App. – Houston [14th Dist.] 1999) (reduced bail of $2,500,000 reasonable in drug trafficking case); *see also Ex parte Reyes*, 4 S.W.3d 353 (Tex. App. – Houston [1st Dist.] 1999) ($3 million bail not excessive in case involving 721 kg of cocaine); *Ex parte Barrera*, 2000 WL 280448 (Tex. App. – Houston [1st Dist.] 2000) (unpublished op.; $3 million bail not excessive in case involving over 2,000 pounds of marijuana). Despite the proliferation of drug trafficking and concomitant prosecutions thereof, even this class of cases apparently has yet to see an approved bail amount more than low seven figures.

10

848, 850 (Tex. Crim. App. 1981) (panel op.). Abuse of discretion review requires more than merely concluding that a trial court did not act in an arbitrary or capricious fashion, but requires a reviewing court to "measure the trial court's ruling against the relevant criteria by which the ruling was made." *Ex parte Beard*, 92 S.W.3d 566, 573 (Tex. App. – Austin 2002), citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g).

## B. Factors for Determining Reasonable Bail

Bail is the security given by a defendant that he will appear in court to answer the accusation brought against him. TEX.CODE CRIM.PROC. ART. 17.01 (Vernon 2013). Bail balances the presumption of innocence of the accused with the compelling interest of the State that the accused appear to answer the accusation against him. *See Balboa v. State*, 612 S.W.2d 553, 556 (Tex.Crim.App. 1981). Excessive bail is constitutionally prohibited. U.S. CONST. AMENDS. VIII & XIV; TEX. CONST. ART. I, §§ 11, 13.[3] Bail is excessive if it is "set in an amount greater than is *reasonably* necessary to satisfy the government's legitimate interests." *Beard,* 92 S.W. 3d at 573 (emphasis added). The primary purpose of an appearance bond (that is, the government's principal legitimate interest) is to

---

[3] While both Dixon's rights under both Federal law and Texas law are implicated by the trial court's refusal to set a reasonable bail amount, the Federal Constitutional and statutory framework for what factors courts should consider is "similar in substance to the factors considered by Texas courts under the Texas constitution and state law." *Ex parte Milburn*, 8 S.W.3d 422, 424 (Tex. App. – Amarillo 1999). Consolidation of these challenges into a single argument has generally been deemed appropriate. *See Ex parte Scott*, 122 S.W.3d 866, 868 (Tex. App. – Fort Worth 2003).

secure the presence of the defendant at trial on the offense charged. *Ex parte Vasquez*, 558 S.W.2d 477, 479 (Tex. Crim. App. 1977); *Ex parte Scott*, 122 S.W.3d 866, 868 (Tex. App. – Fort Worth 2003, no pet.). Bail should not be set so high as to guarantee a defendant's appearance by preventing him from obtaining pretrial release, but should be high enough to reasonably assure the defendant's appearance at trial. *Ex parte Ivey*, 594 S.W.2d 98, 99 (Tex. Crim. App. 1980); *Ex parte Henson*, 131 S.W.3d 645, 646 (Tex. App. – Texarkana 2004).

Ordinarily, a defendant challenging the amount of bail via an application for writ of habeas corpus bears the burden of demonstrating that bail is excessive. *Ex parte Rodriguez*, 595 S.W.2d 549, 550 (Tex. Crim. App. 1980). However, when a trial court orders bail in an amount extraordinary for a given class of case, such a "dramatic departure from prior practice is *at least* suggestive of an abuse of discretion." *Beard*, 92 S.W.3d at 573.

Texas has enacted a statutory framework to help guide courts in ensuring defendants' constitutional rights to reasonable bail are secured. TEX. CODE CRIM. PROC. ANN. ART. 17.15 (Vernon 2013) specifically identifies five specific factors in determining reasonable bail including that bail "shall be sufficiently high to give reasonable assurance that the undertaking [of appearing for trial] will be complied with" but that the "power to require bail is not to be so used as to make it an

instrument of oppression."[4]  *Id.*  Additionally, the nature and circumstances of the

alleged offense are to be considered along with the ability to make bail[5] and the

future safety of a victim of the alleged offense and the community generally.[6]  *Id.*

Courts also look to several common law factors such as a defendant's work record,

family and community ties, length of residency, offered conditions of bond, and

any aggravating circumstances alleged to have been involved in the offense.  *See*

*Rubac*, 611 S.W.2d at 849-50.  Finally, while some authorities have criticized the

use of prior decisions because "appellate decisions on bail matters are often brief

and avoid extended discussions, and because the 'cases are so individualized,'"

courts nevertheless look to prior cases for instruction and, at a minimum, for some

guidance on whether a given bail amount is within a "reasonable zone of

disagreement" or whether it provides "a dramatic departure from prior practice

---

[4]     The prime example of bail being used as an instrument of oppression is when bail is set outside a defendant's reach for the express or implied purpose of keeping the defendant incarcerated pending trial.  *See In re Durst*, 148 S.W.3d 496, 499 (Tex. App. – Houston [14th Dist.] 2004); *Ex parte Harris*, 733 S.W.2d 712, 714 (Tex. App. – Austin 1987, no pet.).  At least one Texas court has implied that other circumstances may lead to oppression.  *Milburn*, 8 S.W.3d at 424 (using forced confinement as one example of oppression, implying that others exist).

[5]     Ability to make bail – like the other factors – is not individually controlling as to what constitutes reasonable bail.  "Just as a defendant's inability to afford bail does not, in itself, demonstrate that bail is excessive, a defendant's ability to afford bail in the amount set does not in itself justify bail in that amount."  *Beard*, 92 S.W.3d at 573.

[6]     In considering who is a "victim" of an offense for purposes of application of Article 17.15(5), a plurality of this Court has stated, without definitively holding, that the term does not "cover anyone not actually a complainant in the charged offense."  *Ludwig v. State*, 812 S.W.2d 323 (Tex. Crim. App. 1991) (per curiam).

13

[which] is at least suggestive of an abuse of discretion." *Beard*, 92 S.W.3d at 571, 573.

## C. The Court of Appeals' Decision

The Court of Appeals found that the record in this case did not establish an abuse of discretion by the trial court. In so doing, the Court of Appeals did not weigh the ten million dollar bail amount and the evidence presented at the writ hearing against the relevant Constitutional and statutory criteria, including whether a bail amount almost seven times higher than any previously imposed in a single capital murder case itself raises an inference that bail is excessive and is being used as an instrument of oppression. The Court of Appeals rather focused its analysis on attempting to give total deference to the trial court's possible, hypothetical evidentiary weight and credibility determinations. See Slip Op. at 10-12. In so doing, the Court of Appeals – in contravention to the opinions of this Court and other courts of appeals – confused a trial court's discretion in giving weight and credence to particular evidence with analysis of how the particular legal factors implicated by the evidence – particularly undisputed evidence – combine to lead to a proper legal conclusion on the reasonableness of a given bond amount. See, *e.g.,* Slip Op. at 11 (despite evidence of Dixon's personal situation and ties to Texas and Amarillo being "essentially undisputed", the trial court could nevertheless "have found them unconvincing", and that "determinations of the weight to be given

14

particular testimony *and of its bearing on the factors for setting bail* were determinations to be made by the trial court." (emphasis added)).  The Court of Appeals thereby abandoned its duty independently "to measure the trial court's ruling against the relevant criteria." *Beard*, 92 S.W.3d at 573.

This is particularly notable because the trial court in this case expressly stated that it was refusing to reduce Dixon's bond on the sole basis that he has been charged with a capital offense (2 RR 36).  The Court of Appeals failed to measure whether this ruling, including the decision to disregard all other factors regarding the propriety of a given bail amount, was within the zone of reasonableness.  Furthermore, the Court of Appeals failed to look to the backdrop of previous bail decisions found to be reasonable (or unreasonable) to determine whether the trial court's ruling based on this lone criterion was within the zone of reasonableness.  By failing to properly consider the amount of bail set in this case against the backdrop of prior approved bail amounts, the Court of Appeals not only condoned the trial court's focus on one single bail factor (the general nature of the charge and possible punishment) but also refused to measure the decision itself (i.e., a refusal to reduce bail from $10 million simply because a capital case is involved) for reasonableness.

> **D.    Proper comparison of the bail amount in this case to those set in previous capital murder cases gives rise to an inference that bail in this case is excessive and oppressive.**

15

In the entirety of reported Texas cases, the highest bail ever approved by an appellate court in a single-count capital murder case appears to be $1,500,000.00. *Ex parte Gonzalez*, 383 S.W.3d 160 (Tex. App. – San Antonio 2012, pet. ref'd). That case expressly noted that prior to its particular facts, the highest capital bail approved, reported or not, "even in the most egregious capital murder cases" was $1,000,000.00. *Id*. at 164, citing *Ex parte Estrada*, 398 S.W.3d 723 (Tex. App. – San Antonio 2008, no pet.). In examining bail amounts, both this Court and the courts of appeals have been guided by previously approved bail amounts, and have viewed wildly disproportionate bail amounts with strong suspicion. *Ludwig v. State*, 812 S.W.2d 323, 324 (Tex. Crim. App. 1991) (per curiam) (observing that at that time, "this Court [had] yet to condone a bail amount even approaching seven figures, even in a capital case."); *Estrada*, 398 S.W.3d at 727 (noting that a detailed review found "no reported Texas case sustaining bail in the amount of $1,000,000, even in the *most egregious capital murder cases*") (emphasis added); *Gonzalez*, 383 S.W.3d at 167 (Tex. App. – San Antonio 2012, pet. ref'd) (Simmons, J., concurring, specifically noting that while the court approved a $1.5 million bail that was "fifty percent higher than any bail amount previously upheld for a single capital murder charge," she felt "compelled to caution against imposing exceedingly large bail amounts that violate the Constitution's prohibition against excessive bail."); *Beard*, 92 S.W.3d at 574 (specifically noting that

16

consideration of the bail set in other capital murder cases provided appropriate guidance against which an $8,000,000 bail was an abuse of discretion).

The bail amount set in this case – ten million dollars – is almost seven times higher than the record amount set in *Gonzalez*. This situation strongly parallels the "dramatic departure from prior practice" found to constitute an abuse of discretion in *Beard*, in which a trial court set bail in an amount at least ten times greater than any previously (at that time) approved in a capital murder case. 92 S.W.3d at 573. The *Beard* court noted that such a departure, standing alone, "is *at least* suggestive of an abuse of discretion," and went on to indeed find such abuse. *Id.* Likewise, the trial court's departure in this case should be determined to be equally abusive of the discretion given it, and the judgment of the Court of Appeals holding to the contrary should be reversed.

    **E.**    **Comparison of the facts of this case measured against all of the criteria for setting of bail, in light of the bail deemed appropriate in other capital cases, reveals that the trial court abused its discretion and that the Court of Appeals erred in holding otherwise.**

The Court of Appeals relied heavily on language from *Beard* (cited *supra*) noting that reported cases have some usefulness limitations to completely dismiss the backdrop of reported (and unreported) Texas cases disapproving high bail amounts and, as a result, to approve the ten million dollar bond set in this case. Slip Op. at 12, citing *Beard*, 92 S.W.3d at 571. In so doing, the Court of Appeals

17

ignored (1) *Beard's* subsequent note that "[n]evertheless, a review of some recent capital murder bail cases is instructive" and (2) the entirety of caselaw developed since *Beard*'s 2002 decision, which has increasingly become lengthy and extended. *See, e.g.*, *Estrada*, 398 S.W.3d 723; *Gonzalez*, 383 S.W.3d 160; *Ex parte Henson*, 131 S.W.3d 645 (Tex. App. – Texarkana 2004); *Beard*, 92 S.W.3d at 571-2.

Turning to the individual bail factors against the backdrop of precedent, in this case, the Court of Appeals focused on the habeas court's role as having also been the trial court as justifying giving outside credence to the trial court's possibly having given outsized weight to the nature and strength of the case against Dixon as a reason justifying approval of the instant bail. Slip Op. at 9-10. By so doing, the Court of Appeals – which had the trial court record before it and which was able to succinctly summarize the factual nature of this case for itself – abdicated its role to independently measure the trial court's refusal to grant relief against the Art. 17.15 statutory criteria, common law factors, and (as note, *supra*, bail amounts in similar cases).

The evidence reflects that this case involves an alleged murder-for-hire against a specific target for a specific motive. Dixon was not accused of having personally been involved in the killing of that specific target. It is undisputed that Dixon has no prior criminal history. There was evidence that Dixon was and remains unable to satisfy such a high bail amount, particularly because he has

18

spent almost three years in jail, and remains in custody now, while any reasonable person with the means to do so would have sought to make bail. While the Court of Appeals faulted Dixon for presenting "meager" evidence of his financial condition, that "meager" evidence included many of the most relevant specifics of major financial assets looked to by this Court and other courts of appeals in bail cases (i.e., there was testimony regarding Dixon's home ownership and value vs. encumbrances, car ownership, and ownership and liquidation of other assets, including securities investments, as well as testimony regarding his ongoing liabilities, that painted a clear picture that Dixon himself is destitute and relying on the largesse of his relatives)[7]. There was also "essentially undisputed" evidence of Dixon's ties to the State of Texas and more particularly the Panhandle region, including his upbringing in Spearman, his practice of medicine in the Amarillo community for almost ten years at the time of the alleged offense, and his relatives (including, but not limited to, his three children and his mother) living in the Amarillo and Spearman areas. There was no evidence that Dixon presents a threat to community safety; even taking the State's allegations as true, his jealousy and anger were directed at Sonnier, who is now deceased. While the State focused on trial evidence that Dixon had traveled once internationally to suggest that he might

---

[7] It is also worth noting that the State has consistently expressed disbelief that Dixon is now essentially without ongoing resources with which to make bail based on the fact that tremendous sums have already been spent on his defense. 2 RR 35. However, a Court "will not imply the existence of financial resources absent evidence of their existence." *Ex parte Davis*, 147 S.W.3d 546, 551 (Tex. App. – Waco 2004).

19

be a flight risk, there was no evidence that he has any ties (much less significant ones) to a foreign country, and Dixon sought to allay fears that he might remove himself from American jurisdiction by surrendering his passport to the trial court. Furthermore, the Court of Appeals noted but failed to properly consider the fact that Dixon was initially questioned, but not arrested, regarding the murder, and that he not only had the opportunity to flee and did not do so, but actually traveled to Dallas for a car transaction and returned immediately to Amarillo. Slip Op. at 4. Finally, Dixon agreed to undergo electronic monitoring as a condition of a bail reduction, even further bolstering the affirmative evidence that Dixon is not a flight risk or a danger to the community, and that even with a reduced bail, "the undertaking will be complied with."

In contrast, the defendant in *Gonzalez* (in which the Texas capital record bail of $1.5 million was determined appropriate) was alleged to have personally committed a violent murder of a public servant with an AR-15 type rifle, with the victim chosen evidently completely at random. 383 S.W.3d at 163. Gonzalez was shown to have an extensive criminal history, and to have recently worked or have addresses in at least five other states and to have extensive ties in Mexico via his mother and wife. *Id.* at 163-64. He was also shown to have applied for a job in Mexico and to have applied for an expedited passport. *Id.* at 164. An individual who provided information to the police was shown to personally know Gonzalez

20

and his character and the individual and his family were also shown to be in fear of reprisal from Gonzalez. *Id.* Evidence also showed that Gonzalez apparently had no qualms about using others to obtain weapons and ammunition, including the murder weapon, and that Gonzalez kept a number of weapons and sizeable quantities of ammunition at his house. *Id.* at 163-64. Gonzalez's evidence of his financial condition also came from a cousin, who (unlike Dixon's mother) was shown to be "wholly unaware of the Gonzalez family finances." *Id.* at 162. Each of these points contrasts sharply with Dixon's case and leads to the conclusion that Dixon's bond should be lower than that approved of the violent cop killer of *Gonzalez*, yet the Court of Appeals erroneously determined that the trial court's refusal to lower Dixon's $10 million bail was not an abuse of discretion.

As asserted *supra*, Dixon's case is more in line with that of *Beard*, in which the defendant was charged with planning the murder of her husband and procuring another to commit the murder, resulting in that defendant receiving significant assets from her husband's estate. 92 S.W.3d at 568-70. Beard's husband did not immediately die, and Beard took steps to interfere with the police investigation of the murder. *Id.* at 568-69. The court also considered that much of the assets received by Beard was consumed in the interim by basic living requirements, gifts to other family members, and significantly, by the "substantial legal expenses" incurred by both matters surrounding her husband's estate as well as the pending

21

murder charges. *Id.* at 570. Medical records reflected that Beard had psychological problems, but was overcoming them, and that there was an outstanding protective order against Beard in favor of her daughters as a result of Beard's acts or threats of physical violence. *Id.* The court also noted that Beard was born in California and had lived in Arizona prior to coming to Texas, and had moved several times between Travis and Tarrant counties, and was married to an individual with strong ties to Tarrant and Dallas counties, and that she had a prior felony conviction in Arizona. *Id.* at 570-71. In discussing the nature and circumstances of the offense and its effect upon an appropriate bail amount, the *Beard* court observed that:

> The murder of which Beard is accused is neither more violent in its commission nor more abhorrent in its alleged motive than other capital murders that come before the courts of this state. Although Beard is accused of planning the commission of a violent crime, there is no evidence that she has been a violent person in the past. . . . [W]e find no evidence in this record that Beard is a serious threat to community safety."

*Id.* at 572. The parallels to Dixon's case are apparent. As with Beard, Dixon is accused of planning and procuring the services of another to commit murder against a specific target for a specific reason, and Dixon has no history of violence. Against this backdrop, taking the nature and circumstances of the alleged offense into consideration, the sheer amount of Dixon's bail – twenty times that determined reasonable in *Beard* and slightly more than that found *un*reasonable

22

therein, on facts stronger and more egregious than the alleged conduct in this case – is sufficient to invoke a presumption that Dixon's bail is excessive, and that bail is being used as an instrument of oppression.

The *Beard* court went on to consider that defendant's ability to make bail, and explicitly viewed the evidence "in the light most favorable to the district court's order", finding it "evident that Beard has access to financial resources exceeding those of most criminal defendants." *Id*. at 573. While the Austin court accepted these propositions *arguendo*, and even without a detailed showing of what Beard's financial resources were, that court noted that access to resources giving a defendant the "ability to afford bail in the amount set does not in itself justify bail in that amount." *Id*. The court also observed that while the State argued that Beard "would be likely to flee" if bail were reduced, the circumstances reflected that Beard had the opportunity to flee after her alleged accomplice was arrested (as did Dixon), and that she had surrendered her passport to the court (as did Dixon). *Id*. The appellate court therefore found that there was no evidence that Beard represented "an unusual flight risk." Dixon's circumstances in this regard are not only squarely in line with those in *Beard*, but Dixon went a step further by volunteering for electronic GPS monitoring, even further reducing the chance that he might fail to comply with the undertaking of bail, even if bail were set comparatively low.

*Beard* concluded by noting that the trial court had set her bail at $8,000,000, and that such amount was "more than eight times higher than the highest bail previously determined to be reasonable in a reported Texas capital murder case. Such a dramatic departure from prior practice is at least suggestive of an abuse of discretion."[8]  *Id.*  As with *Beard*, the trial court in this case set bail almost seven times higher than the previous record-high reasonable bail in a capital case, and just as in *Beard*, this dramatic departure from prior practice is at least suggestive – if not presumptive – of an abuse of discretion.  The Court of Appeals in this case therefore decided this case in a way that conflicts directly with the prior decisions of the Austin Court of Appeals and with this Court and other courts of appeals, and this Court should therefore exercise its supervisory power.

### F.    The bail amount set in this case has the effect of operating as an instrument of oppression

Bail set so high as to guarantee a defendant's appearance at trial (by ensuring that the defendant does not make bail) becomes an instrument of

---

[8]    Without belaboring the issue, there is another Texas case instructive both for its lengthy discussions of the factors regarding bail as well as its outcome:  *In re Durst*, 148 S.W.3d 496 (Tex. App. – Houston [14th Dist.] 2004) (op. on reh'g).  In *Durst*, the now-notorious heir of a real estate magnate was charged with three third-degree felonies related to his failure to appear while on bond for murder (of which he was eventually acquitted) and for mutilation of the corpse; despite the clear evidence that Durst had access to resources in the millions, his clear willingness to abscond, given his flight after posting a $300,000 cash bond in the murder case, and his danger to the community, the 14th District Court of Appeals nevertheless found that setting bond in the amount of one billion dollars per case constituted an abuse of discretion, and reduced bond to $150,000 per case.  *Durst* at 500-502.  The *Durst* court specifically found that despite this "triple risk," conditions of bond such as monitoring and surrender of a passport specifically warrant a lowered bail amount.  *Id.* at 501.

24

oppression. *Ex parte Henson*, 131 S.W.3d 645, citing *Ex parte Ivey*, 594 S.W.2d at 99. This is precisely what has occurred in this case; the Court of Appeals has sanctioned the trial court's refusal to lower bail not on the basis that a lower bail would be unlikely to secure Dixon's appearance, but simply on the basis of the trial court's possible evaluation of the case against Dixon and determination that Dixon deserves to be in prison. This makes the bail set in this case punitive in nature, and implies that it has been set deliberately beyond the ability of Dr. Dixon and his combined immediate family to satisfy. This is the definition of oppression, and this Court should reverse the departure of the Court of Appeals from the accepted and usual course of judicial proceedings.

Furthermore, even assuming, *arguendo*, that the money which Dixon's family has spent on his defense was available to him at the outset of this case, bail in this case has been set so high for the duration of this case as to force Dr. Dixon to have to choose between which Constitutional right is more important to him: the right to release on reasonable bail versus the right to mount a defense via retention of effective counsel. There appear to be no cases dealing with this issue, but it is troubling that the State has consistently argued that Dr. Dixon's choice to expend his previously-available resources on effective counsel should be held against him. The State thus implicitly asserts that because the resources expended might have been able to secure his release *before* his first trial, that the trial court is

therefore justified in continuing that punitive bail amount *after* the defendant has exhausted his available resources. *See*, *e.g.*, State's Brief on Appeal at 21. This position effectively punishes Dr. Dixon for vigorously contesting whether he is guilty of any offense (i.e., for insisting on due process of law with effective assistance of counsel to the detriment of pretrial release), and itself falls within the ambit of what the Framers would certainly regard as "oppression."

## CONCLUSION AND PRAYER

For the foregoing reasons, Appellant Thomas Michael Dixon respectfully submits that the trial court erred by refusing to reduce the amount of his bail pending a second trial for capital murder, and that the Court of Appeals further erred by sanctioning the trial court's error, in contravention of relevant precedent of this Court and other courts of appeals. Appellant further submits that these departures and conflicts warrant this Court exercising its power of supervision, and that on consideration of the Article 17.15 factors as well as general factors for consideration in bail reduction cases, this Court should reverse the judgment of the Court of Appeals, find that the trial court abused its discretion, and should render judgment setting bail in the amount of $100,000.00, subject to such terms and conditions as the Court deems appropriate, or for such other relief as Appellant may be entitled.

Respectfully submitted,

HURLEY, GUINN & SELLERS
1805 13th Street
Lubbock, Texas 79401
(806) 771-0700
(806) 763-8199 fax

BY: /s/ Aaron R. Clements
AARON R. CLEMENTS
SBN 00795861
e-mail: aaronrc@swbell.net

27

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing brief was served on opposing counsel via email to the Lauren Murphree, Lubbock County District Attorney's Office, lmurphree@lubbockcda.com, on this the 18th day of June, 2015, and via email to the State Prosecuting Attorney's Office, information@spa.texas.gov.

/s/Aaron R. Clements
AARON R. CLEMENTS

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with Tex.R.App.P. 9.4(i) inasmuch as according to the word count function of Microsoft Word 2003, this brief contains 5,618 words exclusive of the matters listed in that Rule, and that this is a computer-generated document using 14-point or larger typeface for all text except footnotes, which are in 12-point typeface.

/s/ Aaron R. Clements
AARON R. CLEMENTS